**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1562-15T4

REGINALD P. GAMBLE and
DION M. HOPPER, His Wife,

    Plaintiffs-Appellants,

v.

PROGRESSIVE MOTION MEDICAL
PRODUCT SOLUTIONS, ADVANTUS
MEDICAL HEADQUARTERS and DJ
ORTHOPEDICS, LLC,

    Defendants,

and

BRIAN VAN GROUW, D.O.,

    Defendant-Respondent.

_____

Argued December 18, 2017 — Decided July 11, 2018

Before Judges Messano, Accurso and O'Connor.

On appeal from Superior Court of New Jersey,
Law Division, Bergen County, Docket No.
L-4167-11.

Paul M. da Costa argued the cause for
appellants (Snyder Sarno D'Aniello Maceri &
da Costa, LLC, attorneys; Paul M. da Costa,
of counsel and on the brief; Sarah L. Davis,
on the brief).

Michael J. McBride argued the cause for respondent (Mattia & McBride, PC, attorneys; Phillip F. Mattia, Haley K. Grieco and Zachary G. Farnsworth, on the brief).

PER CURIAM

Following a lengthy trial in this medical malpractice action, a jury determined defendant Brian Van Grouw, D.O., deviated from accepted standards of medical care when he treated plaintiff Reginald P. Gamble, but found such treatment did not proximately cause the damages plaintiff claimed arose from the alleged deviations.[1]  Plaintiff and his spouse, Dion M. Hopper, who asserted a per quod claim against Dr. Van Grouw, appeal from an October 29, 2015 order denying plaintiffs' motion for judgment notwithstanding the verdict, a mistrial, or new trial.[2]

After reviewing the evidence adduced at trial, the parties' arguments, and the applicable legal principles, we affirm.

I

We summarize the salient evidence.  In 2009, plaintiff consulted with defendant, an orthopedic surgeon, about pain he had been experiencing in both knees.  On May 13, 2009, defendant performed an arthroscopy on plaintiff's left knee to remove the

---

[1]  By the time of trial, Dr. Van Grouw was the sole defendant, plaintiff having previously settled with all other defendants.

[2]  For simplicity, for the remainder of this opinion the term "plaintiff" shall refer to Reginald P. Gamble only.

meniscus.  Following surgery, defendant prescribed a cryotherapy device (device) for plaintiff to use at home to help control post-surgical pain and swelling.  When in use, cold water from the device flowed across plaintiff's bandaged knee.

Defendant testified that both he and his staff instructed plaintiff to use the device continuously during the first seventy-two hours following surgery and, thereafter, as needed to control any pain or swelling.  In addition, in general he advises all patients using the device to contact him if any "issues" arise with respect to "drainage, redness, warmth."

Plaintiff testified he used the device continuously during seventy-two hours immediately following surgery and as necessary thereafter.  Starting with the third day following surgery, plaintiff used the machine every other hour for an hour.  On May 18, 2009, the fifth day following surgery, plaintiff began to feel numbness in his knee.  Because he was also experiencing what he believed was an abnormal amount of swelling and bleeding, plaintiff contacted and saw defendant in his office that day.

According to defendant's office notes, plaintiff complained of having a lot of pain in his knee, swelling, and some bleeding.  Defendant testified fluid had accumulated in plaintiff's knee, making it appear swollen, a common post-

3

operative occurrence. It is not disputed defendant aspirated the fluid from the knee and instructed plaintiff to return in a week for another checkup.

On May 26, 2009, plaintiff returned to defendant's office for the scheduled follow-up visit, during which defendant's office notes reflect fluid had again accumulated in the knee. Defendant again drained the knee, but testified the knee "appeared to be good," and that there was nothing that made him "overly concerned." Plaintiff testified his knee was still painful at that second office visit and that defendant advised him to continue using the cryotherapy device as needed for pain.

On June 4, 2009, plaintiff returned to defendant's office for a follow-up visit. Defendant's office notes reflect plaintiff was complaining of "a lot" of pain, tenderness, and swelling. Plaintiff testified there was "dark black skin" and blisters forming on his knee; defendant's office notes do not mention changes in plaintiff's skin color or the presence of blisters. Defendant testified he found a small amount of fluid in the knee, which he did not consider to be abnormal. He directed plaintiff to attend physical therapy because the muscles around the knee had grown weak and stiff from lack of use.

4

On June 12, 2009, plaintiff called defendant's office seeking renewal of a prescription for pain medication. Defendant's office notes indicate plaintiff reported he was "doing better" and that physical therapy was "going well." However, on June 20, 2009, plaintiff went to an emergency room because he was experiencing increased knee pain and nausea; he was subsequently admitted into the hospital, where he remained until August. Defendant did not treat plaintiff after June 20, 2009.

At the time of his admission, significant eschar was noted to have formed over a wound on plaintiff's knee; eschar is dead, necrotic tissue. Two days after plaintiff's admission, the eschar was surgically debrided[3] in an effort to induce new skin to grow. However, the wound over plaintiff's knee did not heal, and additional eschar developed and had to be removed.

Subsequent testing and additional surgical procedures revealed the bones and joints of plaintiff's knee were deteriorating as the result of osteomyelitis, an infection of the bone. In fact, there was concern plaintiff would lose his leg. When plaintiff was discharged in August, the fate of his leg was still uncertain. Eventually, his treating physicians

---

[3] Debridement is the removal of damaged tissue or foreign objects from a wound. Stedman's Medical Dictionary 496 (28th ed. 2006).

were able to salvage the leg by fusing plaintiff's knee.

Plaintiff filed a medical malpractice complaint against defendant, alleging he committed various deviations from accepted standards of medical care during the period immediately following the arthroscopy. Plaintiff further contended that as a proximate result of such deviations, he was forced to and will endure pain and suffering, including but not limited to the fusion of his knee.

During trial, each party called various medical experts on the issue of liability and damages. The most sharply contested issue was proximate causation. We address this issue first because not only was it the most controversial, it also puts the alleged deviations into perspective.

One of plaintiff's liability experts, orthopedist Stephen H. Marcus, M.D., opined the device caused a thermal injury or "freezer burn" to plaintiff's knee, and did so within the first seventy-two hours of the arthroscopy. Marcus claimed plaintiff's complaints during the post-operative period were caused by the thermal injury, and opined the skin over plaintiff's knee likely exhibited a change in appearance that defendant failed to recognize.

The expert opined that had defendant properly examined plaintiff on June 4, 2009, he would have noted, consistent with

6

plaintiff's observations at that time, signs consistent with a thermal injury, specifically, blistering of the skin and the start of the formation of eschar, which is black in color. Marcus did not state what steps defendant could or should have taken had he recognized plaintiff sustained the alleged thermal injury during the post-operative visits.

Marcus concluded plaintiff ultimately required a fusion of his knee for the following reason. The thermal injury destroyed the skin on plaintiff's knee, requiring surgical procedures to debride the dead tissue. While recuperating in the hospital from such procedures, although bandaged, plaintiff's knee was exposed to certain bacteria found in hospital environments. Such bacteria invaded the wound and subsequently penetrated the bones of plaintiff's knee. The bacteria caused osteomyelitis, which destroyed the bones in plaintiff's knee, necessitating a fusion.

Arnold Lentnek, M.D., plaintiff's infectious disease expert, similarly opined plaintiff sustained a thermal injury caused by the cold water the device circulated over plaintiff's knee, and that such injury likely occurred within seventy-two hours of the arthroscopy. He also stated the thermal injury destroyed the tissue around the knee and, while plaintiff was in the hospital recuperating from procedures to treat such injury,

A-1562-15T4

bacteria entered the wound and eventually infiltrated the bones in plaintiff's left knee, necessitating the fusion.

Plaintiff's experts testified defendant's principal deviations from the standard of care were his failure to: (1) review the FDA label on the device, which warned it may cause frostbite, before prescribing the device to plaintiff; (2) warn plaintiff he might suffer a thermal injury as a result of using the device; (3) personally instruct plaintiff on how to use the device, instead of relegating such task to his staff; (4) advise plaintiff he should not use the device continuously for seventy-two hours; (5) advise plaintiff to contact him if the skin over his knee became red or the sensitivity of the skin changed; and (6) recognize plaintiff had sustained a thermal injury during the post-operative office visits and advise plaintiff to suspend the use of the device.

On the issue of proximate cause, Michael McIlroy, M.D., defendant's infectious disease expert, opined that when plaintiff went to the emergency room on June 20, 2009, he was suffering from bullous cellulitis, a blistering form of infection of the skin. McIlroy pointed out that, early in his admission, tissue removed from plaintiff's left knee was analyzed and revealed the presence of inflammatory cells. He

8

testified such findings showed an infection was present and is not indicative of a thermal injury.

In addition, he noted the tissue was sent to a microbiology laboratory, where a gram stain revealed gram-positive cocci were infiltrating the tissue of plaintiff's knee. McIlroy testified such results were "one hundred percent" proof plaintiff's knee was not only infected, but significantly so. He stated the morphology of the cocci was highly consistent with Staphylococcus aureus (staph aureus), an "aggressive" infection capable of causing the damage to plaintiff' knee. He also mentioned eschar forms when one has bullous cellulitis.

McIlroy further testified the infection in plaintiff's knee was going to occur regardless of plaintiff's use of the device; in fact, he opined in all probability the cool water from the device kept the infection localized, retarding it from spreading up and down plaintiff's leg. McIlroy also noted there were some systemic signs of infection when plaintiff appeared in the emergency room. For example, although plaintiff's white blood count was normal, neutrophils, the cells that fight bacteria, were elevated and very suggestive of infection.

Orthopedist Joseph Bosco, M.D., defendant's expert on deviation, conceded defendant deviated from accepted standards of medical care if he failed to warn plaintiff there was a risk

9

he might sustain a thermal injury if he used the device. Bosco also testified defendant deviated if he did not instruct plaintiff on how to use the device and to look for redness, blisters, and increased pain. Otherwise, according to Bosco, defendant did not deviate from accepted standards of medical care.

Bosco further testified it is more likely than not plaintiff did sustain a thermal injury from the device, although added he was not convinced plaintiff did so to a "medical certainty." However, Bosco did not opine such injury was the proximate cause of the subsequent injuries and damages plaintiff claims in this matter.

As previously stated, the jury found defendant deviated from accepted standards of medical care, but found such deviations were not a proximate cause of his injuries. Following the verdict, plaintiff filed a motion requesting judgment notwithstanding the verdict, a mistrial, or new trial. The trial court denied the motion and this appeal ensued.

There was additional evidence adduced and some procedural developments that arose during the trial relevant to the issues on appeal. For brevity and clarity, we summarize such evidence and developments when we address the particular argument to which they pertain.

10

On appeal, defendant reprises for our consideration the following arguments asserted in his post-trial motion before the trial court:

POINT I: THE TRIAL COURT COMMITTED HARMFUL ERROR BY FAILING TO SUBMIT SEPARATE JURY INTERROGATORIES AS TO EACH ALLEGED DEVIATION FROM ACCEPTED STANDARDS OF PRACTICE ON THE PART OF DEFENDANT, INCLUDING (A) FAILURE TO WARN, (B) FAILURE TO PROPERLY INSTRUCT, AND (C) FAILURE TO TIMELY DIAGNOSE AND TREAT PLAINTIFF'S THERMAL INJURY.

POINT II: THE TRIAL COURT COMMITTED HARMFUL ERROR BY REFUSING TO INCLUDE AN INFORMED CONSENT JURY CHARGE.

A. THE TRIAL COURT COMMITTED HARMFUL ERROR BY REFUSING TO INCLUDE AN INFORMED CONSENT JURY CHARGE INSOFAR AS THE LEARNED INTERMEDIARY DOCTRINE WAS RULED TO APPLY AS A MATTER OF LAW.

B. THE TRIAL COURT COMMITTED HARMFUL ERROR BY REFUSING TO INCLUDE AN INFORMED CONSENT JURY CHARGE SINCE THE PLAINTIFF PROVIDED AN ADEQUATE EVIDENTIAL FOUNDATION IN SUPPORT OF SUCH CHARGE.

POINT III: SINCE THE DOCTRINE OF INFORMED CONSENT SHOULD HAVE BEEN CHARGED TO THE JURY, THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING PLAINTIFF'S MOTION TO BAR ANY REFERENCES AS TO THE DOCTRINE OF AVOIDABLE CONSEQUENCES.

POINT IV: THE TRIAL COURT ABUSED ITS DISCRETION BY DENYING PLAINTIFF'S MOTION FOR PARTIAL JUDGMENT REGARDING DEFENDANT'S

11

FAILURE TO OBTAIN PLAINTIFF'S INFORMED
CONSENT.

POINT V:  THE TRIAL COURT ABUSED ITS
DISCRETION BY DENYING PLAINTIFF'S <u>MCKENNEY</u>
MOTION WHEREIN A CURATIVE INSTRUCTION WAS
REQUESTED BASED UPON THE DEFENDANT'S
MATERIAL CHANGE IN TESTIMONY.

POINT VI:  THE TRIAL COURT ABUSED ITS
DISCRETION IN DENYING PLAINTIFF'S MOTION FOR
A MISTRIAL BASED UPON THE JURY'S MISCONDUCT
AND FAILURE TO FULLY AND FAIRLY DELIBERATE.

We separately address each contention.

A

During its final charge to the jury, the court instructed:

When a physician prescribes a medical device
approved by the [FDA], the prescribing
physician assumes a duty from a manufacturer
of a device to warn patients of known
potential risks associated with the use of
the device.

The court has found as a matter of law that
it was solely the defendant's legal duty to
inform and warn the plaintiff, Reginald
Gamble, regarding the cryotherapy devices.

Next, I'm going to move on to a discussion
of duty and negligence.

Plaintiffs . . . contend that the defendant
. . . was [1] negligent in failing to
properly warn and inform the plaintiff
regarding the cryotherapy device, [2]
negligent in instructing the plaintiff on
the usage of the cryotherapy device, and [3]
negligent in the failure to diagnose and
threat the alleged thermal injury of
plaintiff . . . .

12

On the issue of deviation and proximate causation, the verdict sheet instructed the jury to answer the following two interrogatories:

> 1. Have the plaintiffs proven by a preponderance of the evidence that the defendant, Brian Van Grouw, D.O., deviated from accepted standards of medical practice?
>
> 2. Have the plaintiffs proven by a preponderance of the evidence that said negligence was a proximate cause of injury to the plaintiff Reginald P. Gamble?

The jury answered "yes" to the first and "no" to the second question.

Plaintiff did not object to the charge, but did object to the fact that the three deviations set forth in the charge were not broken down into three separate questions on the verdict sheet. On appeal, he argues the verdict was ambiguous because, in answering the first of the two questions cited above, it is not known which of the three alleged deviations the jury found. Plaintiff further contends the verdict on deviation was "inherently inconsistent and contradictory" when compared to the verdict on proximate cause. Plaintiff's complaint about the alleged deficiency of the verdict sheet is confined to the allegation defendant deviated by failing to diagnose and treat a thermal injury.

A-1562-15T4

Plaintiff argues that if the jury found defendant deviated because he failed to treat and diagnose a thermal injury, then the jury inherently found plaintiff did sustain a thermal injury and, therefore, "the jury's final determination as to proximate cause was completely contradictory to its finding of [deviation]. . . . As such, . . . the trial court's ambiguous and incomplete interrogatories were clearly capable, and did in fact, produce an unjust result in the form of a completely inconsistent jury verdict." We disagree.

"[A] trial court's interrogatories to a jury are not grounds for a reversal unless they were misleading, confusing, or ambiguous." Sons of Thunder v. Borden, 148 N.J. 396, 418 (1997). Further, when "reviewing an interrogatory for reversible error," the interrogatory should be "consider[ed] . . . in the context of the [jury] charge as a whole," as "[a]n accurate and thorough jury charge often can cure the potential for confusion that may be present in an interrogatory." Ponzo v. Pelle, 166 N.J. 481, 491 (2001) (citing Thunder, 148 N.J. at 415-20).

First, we note that, although there was evidence from plaintiff's experts that defendant deviated because he allegedly failed to recognize the signs of thermal injury, there was no evidence about the treatment defendant was required to

14

administer once such injury manifested itself, other than to advise plaintiff to suspend using the cryotherapy device.

Second, and more important, even if plaintiff sustained a thermal injury, the jury found such injury was not a proximate cause of his damages. Plaintiff contended a thermal injury caused the tissue around his knee to deteriorate, the reason he went to the hospital on June 20, 2009. Then, while in the hospital for treatment of such condition, he contracted an infection that caused him to develop osteomyelitis. The osteomyelitis in turn caused the destruction of the bones in his knee, necessitating a fusion.

Defendant, on the other hand, contended the problem plaintiff was having with his knee when he entered the hospital was not caused by a thermal injury but by bullous cellulitis, an aggressive form of infection. Defendant claims this particular infection, not a thermal injury, proximately caused plaintiff's damages.

In our view, there was ample evidence for the jury to find plaintiff's injuries were caused by bullous cellulitis. The jury was at liberty to reject the evidence plaintiff introduced in support of his claim the proximate cause of his damages was a thermal injury. Accordingly, even if the jury found defendant deviated from accepted standards of medical care by failing to

15

diagnose and treat a thermal injury, it is obvious from its answer to the second question on the verdict sheet the jury determined such injury was not a proximate cause of plaintiff's damages.

B

Defendant next contends the trial court erred when it declined to charge the jury on informed consent. Defendant argues that, because the learned intermediary doctrine[4] applied and he provided sufficient evidence thermal injury is a risk of using the subject device, the court was obligated to charge the jury on informed consent. He maintains the trial court's refusal to "include an informed consent charge was not only inconsistent, but also clearly prejudicial to the plaintiffs[,]"

---

[4] Because a physician functions as an intermediary between manufacturer and consumer, under the learned intermediary doctrine, "a pharmaceutical manufacturer generally discharges its duty to warn the ultimate user of prescription drugs by supplying physicians with information about the drug's dangerous propensities." Niemiera by Niewmiera v. Schneider, 114 N.J. 550, 559 (1989).

Just before trial, the court determined such doctrine applied in this matter. As indicated by the excerpt from the jury charge recited above, consistent with its ruling, the court instructed the jury that "[t]he court has found as a matter of law that it was solely the defendant's legal duty to inform and warn the plaintiff, Reginald Gamble, regarding the cryotherapy devices."

16

especially given defendant admitted he did not warn plaintiff of the risk of thermal injury.  We disagree.

"[A] patient has several avenues of relief against a doctor: (1) deviation from the standard of care (medical malpractice); (2) lack of informed consent; and (3) battery." Howard v. Univ. of Med. & Dentistry of N.J., 172 N.J. 537, 545 (2002) (citing Colucci v. Oppenheim, 326 N.J. Super. 166, 180 (App. Div. 1999)).  "Although each cause of action is based on different theoretical underpinnings, 'it is now clear that deviation from the standard of care and failure to obtain informed consent are simply sub-groups of a broad claim of medical negligence.'"  Ibid. (quoting Colucci, 326 N.J. Super. at 180).

To prove a physician was negligent premised upon a theory of lack of informed consent, a plaintiff must show:

> (1) the physician failed to comply with the applicable standard for disclosure; (2) the undisclosed risk occurred and harmed the plaintiff; (3) a reasonable person under the circumstances would not have consented and submitted to the operation or surgical procedure had he or she been so informed; and (4) the operation or surgical procedure was a proximate cause of plaintiff's injuries.
>
> [Newmark-Shortino v. Buna, 427 N.J. Super. 285, 304 (App. Div. 2012) (quoting Teilhaber v. Greene, 320 N.J. Super. 453, 465 (App. Div. 1999)).]

17

Here, the "procedure" at issue was the use of the cryotherapy device, and the undisclosed risk was thermal injury.

In light of the jury's determination defendant's deviations from accepted standards of medical care were not the proximate cause of his damages, the court's failure to charge the jury on informed consent was entirely harmless and clearly not capable of producing an unjust result. See R. 2:10-2 ("Any error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result . . . ."). As is evident from the jury's verdict, neither a thermal injury nor the procedure was deemed a proximate cause of plaintiff's injuries.

C

Plaintiff contends the doctrine of avoidable consequences did not apply in this matter. The doctrine of avoidable consequences "provides that, in instances in which a defendant has committed an actionable wrong, damages flowing from that wrong will be precluded to the extent that they could have been averted by an exercise of reasonable care by the injured party." Geler v. Akawie, 358 N.J. Super. 437, 458 (App. Div. 2003).

In his brief before us, plaintiff claims defendant made "numerous references to the plaintiff's alleged misuse of the

18

cryotherapy device and alluded to his 'responsibility' regarding same. These references were entirely inappropriate and clearly prejudicial to plaintiffs."

With one exception, contrary to Rule 2:6-2(a)(5), plaintiff fails to provide citations to the record in support of his assertion defendant made numerous comments that plaintiff had misused the device. In the one instance for which he does provide a citation to the trial transcript, the record reveals defense counsel asked plaintiff if he agreed it was his responsibility to read and fully understand the instructions that came with the cryotherapy device. Plaintiff's counsel immediately objected and the court sustained the objection. Defendant then withdrew the question.

We are fully satisfied plaintiff was not in any way prejudiced by this question. Further discussion on this point is unnecessary.

D

Plaintiff contends the trial court erred when it denied his motion for a mistrial. Plaintiff had contended a juror engaged in misconduct and failed to fully and fairly deliberate. The details are as follows.

The jury began its deliberations at 2:18 p.m. on April 21, 2015 and was discharged for the day at approximately 4:30 p.m.

19

The jury resumed deliberations the following day at 9:20 a.m. At approximately 11:01 a.m., the court asked through court staff if the jury wanted a recess; the jury responded it needed "five more minutes."

At 11:08 a.m., juror six caught the court clerk's attention by opening the door of the jury room. The juror informed the clerk she had just learned her son had been arrested and was "really upset." The juror retreated to the jury room with the rest of the jurors.

While the jury remained in the jury room, the court discussed with counsel how best to proceed. The court determined the jury would take a break and, in the meantime, the court and counsel would bring juror six into chambers to discuss her problem. The court then brought the jury out to the court room and asked if it was ready for a break. A juror replied the jury had reached a verdict. The jury remained in the court room and the court took the verdict.

After the jury was discharged but before counsel left the court room, plaintiff's counsel requested a mistrial because, "clearly [juror six] had her cell phone accessible and was, at minimum, receiving a call or looking at text messages. . . . And the timing of that all was really in close connection with this jury's verdict." In a brief he subsequently filed,

20

plaintiff argued juror six's access to the electronic device tainted the jury deliberation process and invalidated the integrity of the verdict.

We note that, at the outset of the trial, the jury was instructed that while in the jury room, all cell phones and other communication devices had to be turned off. The jury was advised it would be given a telephone number at which a juror could be contacted during the trial, if need be.

The trial court denied the motion for a mistrial, finding:

> While it does indeed appear that juror number six accessed an electronic device from which she learned about her son's crisis, the event did occur contemporaneous to the conclusion of the deliberations. One must carefully analyze the timing. . . . [I]t is clear that juror number six merely put on her device after the deliberations were complete. . . . [B]etween 11:08 a.m. and 11:14 a.m., juror [six] informed [the court] of the issue. A sidebar conference was held regarding the issue and before the discussion was completed, the jury returned their verdict. The jury was then polled and dismissed at 11:14 a.m.
>
> It is intuitive that in the six minutes at issue there could be no opportunity for juror number six to influence the other jurors. There simply was inadequate time to do so. Thus, one must come to no other conclusion that the deliberations were complete after which juror number six accessed her device. One must also come to the conclusion that the jurors were at the end of the deliberative process when they requested a few minutes more. It is

21

certainly reasonable, observing the process as a whole, to find the jury was merely completing the final form when juror number six put on her cell phone and received her distressing news. The deliberations were completed at that point.

The court also noted plaintiff did not object to receiving the verdict when the jury advised the court it had a verdict, and did not request, before the jury was discharged, further exploration into when juror six received the news of her son's arrest in relation to when the jury concluded its deliberations.

On appeal, plaintiff argues the trial court abused its discretion by denying his motion for a mistrial, contending the "events clearly evidence[]" juror six learned of her son's arrest only a short time before the jury reached its verdict. Plaintiff asserts because she was in a state of stress, juror six was unable to properly deliberate and may have rushed to conclusions on some of the issues just to hasten deliberations.

"The grant of a mistrial is an extraordinary remedy that should be exercised only to prevent manifest injustice." Belmont Condo. Ass'n, Inc. v. Geibel, 432 N.J. Super. 52, 97 (App. Div. 2013) (citing State v. Ribalta, 277 N.J. Super. 277, 291 (App. Div. 1994)). "Whether manifest necessity mandates the grant of a mistrial depends on the specific facts of the case and the sound discretion of the court." State v. Allah, 170

22

N.J. 269, 280 (2002) (citing State v. Loyal, 164 N.J. 418, 435 (2000)). In addition, when the basis for the requested mistrial is alleged juror misconduct, the trial court is in the best position to gauge the effect of the alleged juror impropriety and defer to its decision on a motion for a mistrial. State v. Harvey, 151 N.J. 117, 205 (1997).

In our view, the trial court did not abuse its discretion when it denied plaintiff's motion for a mistrial. The court carefully reviewed the timing of how events unfolded and determined it unlikely the verdict was reached after juror six accessed her phone. We agree with the court's assessment and conclusions, and affirm its decision on plaintiff's motion for the reasons set forth in its opinion.

E

We have considered plaintiff's remaining argument points, and have determined they are without sufficient merit to warrant discussion in a written opinion. See R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

23