740 A.2d 1101 (1999)
326 N.J. Super. 166
Donald COLUCCI, Plaintiff-Appellant,
v.
William OPPENHEIM, M.D., Defendant-Respondent.
and
St. Barnabas Medical Center, Defendant.
Superior Court of New Jersey, Appellate Division.
Argued October 20, 1999.
Decided November 22, 1999.
*1103 Anthony M. Mahoney, Westfield, for plaintiff-appellant (Mahoney and Mahoney, attorneys; Mr. Mahoney, of counsel and on the brief; Dennis M. Mahoney, on the brief).
David P. Weeks, Woodbridge, for defendant-respondent (Ruprecht, Hart & Weeks, attorneys; Mr. Weeks, of counsel; Michael R. Ricciardulli, on the brief).
Before Judges KESTIN, WEFING and STEINBERG.
*1102 The opinion of the court was delivered by STEINBERG, J.A.D.
In this medical malpractice case, plaintiff Donald Colucci appeals from an order dismissing his complaint against defendant William Oppenheim, M.D. with prejudice based upon a jury verdict of no cause for action, as well as from an order denying his motion for judgment notwithstanding the verdict or, in the alternative, a new trial. We reverse.[1]
On September 19, 1992, plaintiff, an Essex County Sheriff's Detective attached to the Fugitive Warrant Squad, while on *1104 the job, sustained an injury to his left knee. Arthoscopic surgery was unsuccessful. Accordingly, in October 1993, plaintiff met with defendant, an orthopedic surgeon, to discuss his treatment options. Plaintiff was accompanied by Judy Jordano, R.N., his rehabilitation nurse and case manager assigned to him by his employer's workers' compensation insurance carrier. According to plaintiff, defendant recommended performance of an osteotomy. Plaintiff said defendant advised him that an osteotomy involved a realignment of the bones in his left knee. Defendant also explained that pins would have to be inserted into his knee in order to hold the realignment in place. According to plaintiff, he was told that at least one pin would be protruding from his skin. He denied that defendant ever used the word "screw". Plaintiff also denied that defendant ever advised him that an open wedge osteotomywhich involved defendant's having to fracture his leg, realign it and hold it in place with an external fixator devicewas to be performed. According to plaintiff, he first became aware that an external fixator had been drilled and screwed into his leg bone when he awoke in the hospital after the surgery.
Plaintiff also testified that defendant never advised him of an alternative procedure known as a closed wedge osteotomy, which involves the use of a closed long leg cast and an internal fixator as opposed to the application of an external fixator. Moreover, a closed wedge osteotomy does not involve screws or pins protruding from the patient's leg. Plaintiff contended that a closed wedge osteotomy would therefore create a lesser risk of infection.
On the other hand, defendant testified that he discussed the possibility of a closed wedge osteotomy with plaintiff. Defendant also testified that, in his opinion, since the incision for an open wedge osteotomy was much smaller, there was a decreased risk of infection. According to defendant, he discussed with plaintiff the advantages and disadvantages of both types of surgeries and explained why he recommended the open wedge osteotomy.
Plaintiff testified that had he known what was actually involved in an open wedge osteotomy, and the potential risks involved, he would have sought a second opinion regarding alternate treatment. Before leaving defendant's office, plaintiff was given a magazine article which discussed the open wedge tibial osteotomy. According to plaintiff, he read the article but did not understand it because it was too technical.
Jordano testified that she had no independent recollection of what took place during the meeting between plaintiff and defendant but, according to reports she filed with the insurance carrier, the only two procedures that were discussed were the open wedge osteotomy and a total knee replacement.[2]
The surgery was performed on November 8, 1993, at St. Barnabas Hospital. Plaintiff signed a consent to operate which indicated that the proposed surgical treatment was "upper tibial osteotomy application external fixator left tibia". The consent form was dated November 8, 1993, and indicated it was signed at 6:45 a.m. Plaintiff testified that the consent form did not describe the proposed surgical treatment at the time he signed it, thereby implying that the description was filled in after he signed the form. He said the form was presented to him as he was leaving the "pre-op" room going to the hallway that led to the operating rooms. He said that he signed the form and "within three minutes I was in the operating room". However, according to the anesthesia record, plaintiff was taken to the operating room at 8:00 a.m.
*1105 Post-operative complications developed. Plaintiff is a diabetic and accordingly he is susceptible to an elevated risk of infection. He noted redness around the area of the upper screw sites and returned to defendant's office. He also experienced continued pain and redness of the screw sites as well as some swelling in the leg. In early January 1994, he was readmitted to the hospital because of increasing pain in his leg. Defendant opined that plaintiff had a low-grade infection rather than a pin-site infection. According to defendant, since plaintiff's low-grade infection which defendant referred to as an irritation or small cellulitis had resolved and plaintiff's knee had not sufficiently healed, defendant did not remove the external fixator during plaintiff's January 1994 hospitalization.
Defendant removed the external fixator on March 7, 1994, because, in his judgment, the bone that was being formed was not maturing and there was a recurrence of increased temperature around the pin-sites. On March 15, 1994, plaintiff was again admitted to St. Barnabas Hospital because the pin sites had not closed since the screws had been removed. It was discovered that plaintiff had a blood-borne infection called Methicillin Resistant Staphylococcus Aureus (MRSA).
According to plaintiff, the infection spread throughout his body. He went into a coma; was placed in intensive care on a respirator and feeding tube, and sustained a multiple system failure as a result of the infection. Dr. Leon Smith, who was board certified in infectious diseases, testified that plaintiff, as a result of the infection, had brain abscesses, lung problems, heart murmurs, a blood infection, kidney failure, and spinal abscesses. He opined that an infection had settled into plaintiff's spine causing spinal abscesses. According to plaintiff, he was ultimately required to undergo back surgery since the infection had eaten away the bone of his spine. In addition, plaintiff presented the testimony of Dr. Gary R. Joachim as a medical expert in the field of infectious diseases. Dr. Joachim testified that defendant deviated from the medically accepted standard of care in not recognizing and treating the infection earlier, and in the manner in which he ultimately dealt with the infection. Dr. Joachim also said that defendant's notes demonstrated that defendant had observed lucency in plaintiff's x-ray on January 25, 1994, and that this was a clear sign of a possible infection.
Plaintiff also presented the testimony of Dr. Bennett Futterman, an orthopedic surgeon. Dr. Futterman opined that defendant deviated from the accepted standard of medical care since a closed wedge osteotomy should have been performed because plaintiff was a diabetic and therefore suffered an increased risk of infection. He also opined that defendant deviated from the accepted standard of care in his postoperative management of the pin sites.
The jury found that defendant did not deviate from accepted standards of medical practice in his treatment of plaintiff. The jury also found that defendant failed to disclose adequate information about the material risks associated with the proposed procedure to plaintiff before obtaining his consent. However, the jury also concluded that a reasonable person with the same medical condition as plaintiff, under the same circumstances and properly informed of the risks associated with the proposed procedure, would still have consented to the surgical procedure. Accordingly, consistent with the jury's verdict, the trial judge molded the verdict to one of no cause for action.
On this appeal, plaintiff raises the following arguments: The trial court erred in (1) not charging the jury regarding medical battery; (2) giving an improper charge regarding the exercise of judgment; (3) accusing plaintiff's counsel during summation of making unfair accusations against defendant; (4) removing the issue of lost wages from the jury, and (5) denying plaintiff's post-judgment motions for a judgment notwithstanding the verdict and a new trial.
*1106 We first consider plaintiff's contention that the trial judge improperly accused counsel, during summation, of making unfair accusations against defendant.
During the course of his summation, plaintiff's attorney made the following remarks:
Sometime, ... cases are proven, not by all the evidence that's brought in, not by exhibits, not by charts, not by graphs, sometimes the case is proven by what is not brought in.
These are the defendant's x-rays. These aren't all his x-rays. There are 30, 40, 50 x-rays that were taken of Mr. Colucci, just by Dr. Oppenheim, without getting involved in the hospital records. Every time we went to the office, procedural x-rays, everything else.
The defense, however, is only putting these x-rays in evidence for you to take into the jury, and the dates of these x-rays are as follows. Now Mr. Colucci doesn't have any x-rays. He doesn't walk around with any x-rays, he doesn't walk around with his hospital chart. He's not the doctor. He hasn't made any entries or notes. He only has his recollection, which (defense counsel) indicated is obviously faulty and everything else. He doesn't have any of this documentation. These x-rays cover November 26th of `93, December the 7th of `93 ...
DEFENDANT'S ATTORNEY: Objection, your Honor.
THE COURT: I'll see you at side bar, gentlemen.
(The following takes place at side bar.)
THE COURT: The implications of your testimony [sic] I believe, ... are not proper. The reference to the fact that these are the only x-rays that they put into evidence, implies that they are trying to hide something. If you thought there was something in those other records, you know very well you had ample opportunity to put those x-rays into evidence. That type of argument is completely improper, sir.
PLAINTIFF'S ATTORNEY: Your Honor, there are other x-rays. I can't interpret an x-ray. They are not ...
THE COURT: I'm not talking about interpretation of the x-rays, sir. I said the reference you made is an implication that something is being hidden from these people, which is completely false.
PLAINTIFF'S ATTORNEY: No, it's not being hidden, your Honor. And if there wasn't an objection, I think it would become apparent where I'm going...
THE COURT: It's not apparent, but I will make it apparent, sir.
(The following takes place in open court.)
THE COURT: Counsel referred to you the fact that there are some of defendant's x-rays that have been put into evidence and indicated that there are 30, 40, 50 x-rays that were taken of Mr. Colucci. And then he said, the defense, however, is only putting these x-rays in evidence for you to take into the jury room. That clearly, in my opinion, implies that the defense was keeping from you information which was relevant and material to this case. That is not the fact. And the implication is completely uncalled for.
Indeed, if [plaintiff's attorney] believed that there were other x-rays that were material and relevant to this case, he had full opportunity to present them to you and put them in evidence. The implication that there was some wrongdoing on the part of the defense in trying to keep something from you, is completely uncalled for, and you will disregard it.

* * * * *
PLAINTIFF'S ATTORNEY: The Court is in error as to what I was implying. The x-rays I'm referring to are *1107 actually in evidence and I put them in evidence before you.
THE COURT: Now: [plaintiff's attorney]...
PLAINTIFF'S ATTORNEY: I put, your Honor, the interpretation of the x-rays I'm referring to are in evidence.
THE COURT: You may not have intended the implication but the Court is not in error for what it found from what you said.
PLAINTIFF'S ATTORNEY: I apologize, your Honor.
THE COURT: Very well, sir. Glad to hear it.
PLAINTIFF'S ATTORNEY: I certainly didn't intend what the Court thought. If you turn to the report of January 25, it indicates that there is some lucency over the near cortices. Particularly over the proximal of the two distal screws is noted. He's looking at an x-ray when he saw that. He put the report in evidence. As a physician, he has his x-ray. He could have put the x-ray on a shadow box, as he did with the other x-rays.
DEFENSE COUNSEL: Objection, your Honor.
PLAINTIFF'S ATTORNEY: Your Honor, there's no implication. I think I have a right to comment ...
THE COURT: I'll see you at side bar, sir. Let's not discuss this in front of the jury.
(The following takes place at side bar.)
PLAINTIFF'S ATTORNEY: There is no implication, your Honor. I believe I have a right to fairly comment on what the doctor does and doesn't do with his exhibits. That's all I'm doing.
THE COURT: If you thought something could be established by putting it on the shadow box, during your cross-examination, you could have very well brought that out.
PLAINTIFF'S ATTORNEY: Judge, I don't have an obligation, I believe, to do that on cross-examination. I believe the doctor, it's his x-ray, if he wants to put in a defense based on that x-ray, he has a right to do it.
THE COURT: That's right. And you have a right to cross-examine if you feel that there's anything in that x-ray which supports your position.
PLAINTIFF'S ATTORNEY: Right. But he didn't put it up there, so I can't cross-examination. [sic].
THE COURT: You could have put it up there, sir, could you not?
PLAINTIFF'S ATTORNEY: But he's not my doctor.
THE COURT: And on cross-examination you certainly could, and in fact you didn't. Seems to me implies that you had no basis for doing it. And the implication that there was some basis for doing it is improper, sir.
(The following took place in open court.)
THE COURT: I'm sorry we have to interrupt counsel during summations. Generally we don't do so unless it's absolutely necessary. However, counsel, again, is suggesting by the fact that ... his reference to the fact that the witness did not exhibit the x-rays to which he referred to on a shadow box, was because there was something that he did not want to reveal to you which would have been contrary to his position. The fact of the matter is, [plaintiff's attorney] went through extensive cross-examination with [defendant] as well as the other doctors and expert witnesses, and he was free to put those x-rays on the shadow box and cross-examine the witnesses as to it, if there was anything that would have supported his position and been contrary to the witnesses' position. The fact that he elected to do that indicates that he didn't believe that there was anything that would have served his purpose by doing so.
To imply now, in an argument to you, that there was something in those x-rays *1108 that would have been revealed, had it been put on the shadow box, is completely improper and inconsistent with the trial and trial practice in this Court. There is full opportunity for the defense, as well as the plaintiff, to go with the testimony of these witnesses, not only in the Court, by cross-examination, but before they are in Court and during a discovery process by depositions. Interrogatories, and any other means that we provide under the rules. To imply that there's something being hidden from you or not presented to you, completely, is without foundation, and you are to disregard it.
We begin by observing that counsel is allowed broad latitude in summation. Diakamopoulos v. Monmouth Med. Center, 312 N.J.Super. 20, 32, 711 A.2d 321 (App.Div.1998); Condella v. Cumberland Farms, Inc., 298 N.J.Super. 531, 534, 689 A.2d 872 (L.1996). Nevertheless, counsel's comments must be confined to the facts shown or reasonably suggested by the evidence introduced during the course of the trial. Ibid. Counsel may argue from the evidence any conclusion which a jury is free to reach. Spedick v. Murphy, 266 N.J.Super. 573, 590, 630 A.2d 355 (App.Div.), certif. denied, 134 N.J. 567, 636 A.2d 524 (1993). Indeed, counsel may draw conclusions even if the inferences that the jury is asked to make are improbable, perhaps illogical, erroneous or even absurd, unless they are couched in language transcending the bounds of legitimate argument, or there are no grounds for them in the evidence. Id.at 590-91, 630 A.2d 355. On the other hand, "[c]ounsel, in his summation to a jury should not misstate the evidence nor distort the factual picture". Matthews v. Nelson, 57 N.J.Super. 515, 521, 155 A.2d 111 (App.Div.1959), certif. denied, 31 N.J. 296, 157 A.2d 364 (1960).
Here, we conclude that the trial judge erred in sustaining defendant's objection. Plaintiff's counsel's comments were based upon facts in evidence, or, at least, suggested inferences that could reasonably be drawn from the evidence introduced. After all, in evidence through the testimony of Dr. Joachim and Dr. Futterman was the fact that x-rays taken by defendant on January 25, 1994, depicted lucency. In addition, defendant's own notes of his January 25, 1994 examination referred to lucency as depicted on the x-rays. Counsel had the absolute right to comment upon the fact that defendant referred to other x-rays, and showed other x-rays on the shadow box, yet neglected to mention the January 25, 1994 x-ray depicting lucency. The trial judge erred in sustaining the objection.
We must next determine whether the improper sustaining of the objection necessitates a reversal. We are deeply troubled by the fact that not only did the judge improperly sustain the objection, but he went on to advise the jury that counsel improperly implied to the jury that the defense was keeping from it information which was relevant and material to this case. Injecting his own belief into his instruction to the jury, the judge advised the jury that "that is not the fact". He further advised the jury that the implication of wrong-doing was completely uncalled for and directed the jury to disregard it. In sustaining defense counsel's later objection, the judge advised the jury that counsel was free to put the x-rays on the shadow box if he saw fit to do so. That may be true. However, counsel was not required to do so. Counsel was free to argue any legitimate inferences that could be drawn from the evidence introduced, including defendant's reliance on other x-rays, coupled with his failure to testify regarding the x-ray of January 25, 1994, since the results of that x-ray were in evidence.
The judge compounded the error by advising the jury that counsel's failure to put the x-rays in question on the shadow box "indicates that he didn't believe that there was anything that would have served his purpose by doing so". Finally, he suggested *1109 to the jury that it was "completely improper and inconsistent with the trial and trial practice in this court" to imply that there was something in those x-rays that would have been revealed had they been put on the shadow box. We are satisfied that those remarks, coming from the judge, coupled with the incorrect sustainment of the objection in the first place, had the clear capacity to turn the jury against plaintiff by virtue of the judge's remarks regarding his attorney.
Although great latitude is given to a trial judge in the conduct of a trial, there are limitations on that latitude. Mercer v. Weyerhaeuser Co., 324 N.J.Super. 290, 298, 735 A.2d 576 (App.Div.1999). A trial judge must conduct a trial in a fair and impartial manner without making remarks that might prejudice a party. Cestero v. Ferrara, 110 N.J.Super. 264, 273, 265 A.2d 387 (App.Div.1970), aff'd, 57 N.J. 497, 273 A.2d 761 (1971). To the jury, the trial judge is the symbol of experience, wisdom and impartiality and, as such, must take great care not to throw his judicial weight, even inadvertently, on one side or the other. Mercer v. Weyerhaeuser Co., supra, 324 N.J.Super. at 298, 735 A.2d 576. Therefore, a trial judge should never unfairly criticize counsel in front of the jury. Ibid. Here, we conclude that the remarks of the trial judge in sustaining the objection had the clear capacity to prejudice plaintiff in the eyes of the jury. We cannot conclude with any degree of confidence that the judge's remarks did not deprive plaintiff of a fair trial. We therefore reverse and remand for a new trial.
For guidance of the parties on retrial, we comment briefly regarding some of plaintiff's other contentions. We turn, first, to plaintiff's contention that the trial judge erred in denying his application, made on the eve of trial, to amend his complaint to assert a claim for battery. We recognize that the broad power of amendment should be liberally exercised unless undue prejudice would result. Kernan v. One Washington Park, 154 N.J. 437, 457, 713 A.2d 411 (1998). Nevertheless, the granting of a motion to file an amended complaint always rests in the court's sound discretion. Ibid. While we recognize that ordinarily a motion for leave to amend should be granted even if the ultimate merits of the amendment are uncertain, id. at 456, 713 A.2d 411, we conclude that the judge did not mistakenly exercise his discretion in denying the motion to permit plaintiff to assert, at that late date, a claim for battery.
A plaintiff may assert an action against a doctor for personal injuries under three different theories: deviation from the standard of care; lack of informed consent; battery. Baird v. American Medical Optics, 155 N.J. 54, 69-71, 713 A.2d 1019 (1998); Teilhaber v. Greene, 320 N.J.Super. 453, 463, 727 A.2d 518 (App.Div.1999). Here, plaintiff's case was based upon the theories of deviation from the standard of care and lack of informed consent. Plaintiff's contentions were that defendant failed to advise him of the alternative of a closed wedge osteotomy; failed to advise him of the details of the proposed surgery; and failed to detect and treat the resultant infection. These are claims of lack of informed consent and deviation from care.
Battery, on the other hand, is an intentional tort. Whitley-Woodford v. Jones, 253 N.J.Super. 7, 11, 600 A.2d 946 (App.Div.1992). It occurs when a doctor does not obtain the consent of his patient to perform a particular operative procedure and is, therefore, an unauthorized invasion of the body. Ibid. The battery theory is reserved for those instances where the patient consents to the performance of one kind of operation and the physician performs a substantially different one for which authorization was not obtained, Samoilov v. Raz, 222 N.J.Super. 108, 119, 536 A.2d 275 (App.Div.1987), or where no consent at all is obtained. However, where surgery is authorized but the consent is uninformed, negligence applies *1110 rather than battery. Tonelli v. Khanna, 238 N.J.Super. 121, 127, 569 A.2d 282 (App.Div.), certif. denied, 121 N.J. 657, 583 A.2d 344 (1990). Where a patient consents to surgery, although perhaps not with adequate information, an action for battery is generally inappropriate. Id. at 126-27, 569 A.2d 282. Generally, the battery theory applies where the surgery was completely unauthorized as, for instance, where the plaintiff did not consent to the particular medical treatment provided. Id. at 127, 569 A.2d 282. Simply put, plaintiff's theories throughout the case were those of informed consent and deviation. He had consented to surgery to correct his knee condition; the issue in this regard was whether he had been adequately informed regarding the particular procedure used. Plaintiff has not demonstrated any facts throughout these proceedings, including on appeal, which would entitle him to pursue a claim of battery. The judge did not mistakenly exercise his discretion in denying the application to amend the complaint, and in denying the application at the end of the case to charge battery to the jury.
We next consider plaintiff's contention that the trial judge erred in giving the "standard exercise of judgment charge" which we had specifically criticized in Morlino v. Medical Center of Ocean County, 295 N.J.Super. 113, 684 A.2d 944 (App.Div. 1996). On February 26, 1998, a few days before trial began, our Supreme Court affirmed Morlino. See Morlino v. Medical Center of Ocean County, 152 N.J. 563, 706 A.2d 721 (1998). The Court held that Model Jury Charge 5.36(A), when considered as a whole, does not have the capacity to confuse jurors. However, the Court noted that the charge may benefit from review and referred it to the Supreme Court Committee on Model Jury Charges, Civil, to determine whether fewer than eleven references to "judgment" would adequately communicate to the jury that medicine is not an exact science and that physicians and surgeons must exercise judgment. Id. at 590, 706 A.2d 721. In addition, because of its potential to confuse the jury, the Court stated that the revised charge should eliminate the sentence suggesting that a doctor is not liable for a mistake that results from the exercise of judgment. Ibid. Finally, the Court directed the Committee to attempt to make the entire charge shorter and clearer. Depending upon how the proofs develop at retrial, if the court decides to give an exercise of judgment charge it should consider the Model Jury Charge in effect at the time of retrial, and, in any event, must conform to the suggestions set forth in Morlino, supra. Obviously, it would be extremely helpful to the trial judge if the parties would submit requests to charge pursuant to R. 1:8-7(a). The court should conduct a charge conference, on the record, as was done in this case.
Finally, we address plaintiff's contention that the trial judge erred in removing the issue of lost wages from the jury. For guidance of the parties on retrial, we suggest that if a factual issue is presented whether plaintiff was able to work prior to his treatment by defendant, or would have been able to work at some point in the future, but became permanently and totally disabled as a result of the tortious conduct of defendant, or whether his earning capacity was diminished by the tortious conduct of defendant, a jury question would be presented.
Reversed and remanded for a new trial.
NOTES
[1] The complaint also named St. Barnabas Medical Center as a defendant. Summary judgment was granted to St. Barnabas. Plaintiff does not appeal that determination.
[2] All parties agree that a total knee replacement was not advisable for plaintiff due to his young age at the time.