**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5574-16T4

ALEXIS B. MONGIELLO,

    Plaintiff-Respondent,

v.

GABRIELLE L. GALLAGHER,

    Defendant-Appellant.

_____

Argued February 11, 2019 – Decided  February 26, 2019

Before Judges Haas, Sumners and Mitterhoff.

On appeal from Superior Court of New Jersey, Law Division, Sussex County, Docket No. L-0618-14.

Stephen A. Rudolph argued the cause for appellant (Rudolph & Kayal, attorneys; Stephen A. Rudolph, on the briefs).

Thomas H. Prol argued the cause for respondent (Laddey, Clark & Ryan, LLP, attorneys; Andrew A. Fraser, of counsel; William B. Thayer, on the brief).

PER CURIAM

In this personal injury case, defendant Gabrielle Gallagher appeals from a $1,800,000 verdict the jury entered in favor of plaintiff Alexis Gallagher following a three-day damages-only trial.[1] Defendant also challenges the trial judge's subsequent denial of her motion for a new trial and remittitur. We affirm.

On November 9, 2012, plaintiff[2] was a passenger in a car driven by her boyfriend's mother. They were on their way to pick up plaintiff's boyfriend, who was a Marine on leave for the weekend. While the car was stopped at a traffic light, it was rear-ended by defendant's vehicle. Plaintiff testified that she immediately felt pain in her neck and back.

An ambulance took plaintiff to a hospital, where she was given some pain medication and discharged. Plaintiff testified that her pain continued over the weekend, so she went back to the emergency room, and then followed up with a neurosurgeon, Dr. Chun. The doctor put her neck in an "Aspen Collar" to immobilize it for a couple of days. However, plaintiff did not feel any better

---

[1] Prior to trial, the judge granted plaintiff's motion for partial summary judgment on the issue of liability. After the jury's verdict, the judge entered an amended order of judgment in the amount of $2,041,326.50 in favor of plaintiff, which included fees, costs, and pre-judgment interest.

[2] Plaintiff was nineteen years old at the time of the accident.

A-5574-16T4

after this treatment. She then began a physical therapy (PT) regimen in an attempt to strengthen her neck muscles. However, this did not help ease her pain.

Plaintiff followed up with Dr. Basch, an orthopedic surgeon, who recommended more PT. He also discussed spinal injections and the possible need for surgery. Plaintiff obtained a second opinion from James Dwyer, M.D., who was qualified at trial as an expert in orthopedics and spine surgery. Dr. Dwyer also recommended a spinal injection in an attempt to address plaintiff's pain. After reviewing the risks of this treatment, plaintiff agreed to undergo an epidural spinal injection procedure, which made her nauseous and, ultimately, did little to alleviate her condition. As a result, plaintiff continued to participate in PT and take pain medication, especially at night in order to be able to sleep.

Plaintiff had been active in sports while in high school, where she ran track and played lacrosse. After high school, she continued to participate in a number of outdoor activities, like hiking and jet skiing. Plaintiff stated that her real passion was cooking and, after attending a community college, she enrolled in the Culinary Institute of America (CIA) in Hyde Park, New York, with the dream of becoming a chef. However, plaintiff testified that her neck pain did not allow her to look down for long periods of time, which prevented her from

3

using a cutting board or performing the other tasks necessary to pursue this goal.

Plaintiff testified that her ability to perform everyday activities, such as drying her hair or taking a shower, was also negatively impacted by her constant pain.

Plaintiff's mother, Lynn,[3] testified on plaintiff's behalf, and her testimony largely mirrored that of her daughter. Lynn, who was a registered nurse, stated that plaintiff was an active young adult prior to the accident. Since her injury, however, plaintiff complained of pain every day, was unable to pursue her goal of becoming a chef with her own restaurant, and seemed depressed most of the time. Lynn stated that plaintiff continued to receive medical treatment, but the doctors had advised them that "eventually she'll need . . . surgery."

Plaintiff presented the de bene esse deposition testimony of Richard Snellings, M.D., who was qualified as an expert in diagnostic radiology. Dr. Snellings testified that based of his review of two MRIs and a number of X-rays taken of plaintiff's spine, plaintiff suffered from an abnormal straightening of her cervical lordosis, which made it very difficult for her to bend her back or neck. The doctor also found that plaintiff had a spinal disc herniation at the C6-7 level, which was causing compression on "the ventral aspect of the thecal sac

---

[3] Because plaintiff and her mother share the same surname, we refer to plaintiff's mother as Lynn to avoid confusion. In doing so, we intend no disrespect.

where the nerves are located."  Dr. Snellings found that this injury had been caused by the car accident, and was a serious condition because

> it's a permanent injury.  It's a damage to the disc.  Once you . . . tear the[] the lining of the disc, it's basically a death sentence for the disc when the material starts to leak out because that material will never go back into the disc.  So . . . it's a permanent injury that's never going to go back to its normal preinjury state.

Plaintiff also introduced Dr. Dwyer's de bene esse deposition at trial.  Dr. Dwyer had been treating plaintiff since August 2015.  He opined that plaintiff suffered a herniated disc protruding at the C6-7 level, with significant muscle spasm, in the accident.  Dr. Dwyer also observed that plaintiff's spine was abnormally straight as the result of this condition, which contributed to her neck and back pain.  Dr. Dwyer testified that the spinal injection he administered to plaintiff did not help her condition "to any great degree" and, as a result, anterior cervical discectomy fusion surgery was being considered as "the likely next step for her."[4]  However, Dr. Dwyer stated that while surgery, if successful, might relieve plaintiff's pain, she would never have a normal spine and would continue

---

[4]  Plaintiff's attorney played an edited four-minute video of an anterior cervical discectomy fusion surgery for the jury.  The actual surgery takes approximately ninety minutes to two hours.

A-5574-16T4

to have pain.  Thus, he opined that plaintiff's condition was permanent and that her prognosis was only "fair to guarded."

Defendant presented the testimony of his orthopedic surgery expert, David Rubinfeld, M.D., by introducing his de bene esse deposition.  Contrary to the opinions expressed by plaintiff's experts, Dr. Rubinfeld stated that plaintiff suffered from a cervical and lumbar spine sprain, with possible radiculopathy.  He found that there was a posterior prominence of the C6-7 disc, but it was not in contact with any of the neural structures.  As a result, Dr. Rubinfeld opined that plaintiff's prognosis was good.

Defendant also presented the de bene esse deposition testimony of Roger Berg, M.D., F.A.C.R., who was qualified as an expert in radiology.  Based upon his review of plaintiff's film studies, Dr. Berg concluded that plaintiff's "spinal cord was normal and everything else was perfectly intact."  He opined that plaintiff "sustained no discernable injuries to her cervical spine or discs or the nerve roots as a result of the November 2012 accident."

After the jury returned its verdict in plaintiff's favor, defendant filed a motion for a new trial, raising many of the same arguments she now presents on appeal.  The judge denied the motion, as well as defendant's motion for a

6

remittitur, and set forth his reasons in a series of detailed oral rulings.  This

appeal followed.

On appeal, defendant raises the following arguments:

I. A NEW TRIAL IS WARRANTED BECAUSE OF PLAINTIFF'S COUNSEL'S INFLAMMATORY AND IMPROPER COMMENTS, MADE WITHIN EARSHOT OF THE JURY, THAT "THIS DEFENDANT HAS NOTHING TO DO WITH [THE] VERDICT AND THERE'S AN INSURANCE CARRIER INVOLVED IN THIS CASE."

II. A NEW TRIAL IS WARRANTED BECAUSE OF PLAINTIFF'S COUNSEL'S INFLAMMATORY AND IMPROPER COMMENTS DURING SUMMATION THAT PLAINTIFF'S ALLEGED INJURY (A SINGLE UNOPERATED HERNIATION) WAS A "DEATH SENTENCE" FOR HER.

III. A NEW TRIAL IS WARRANTED BECAUSE THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT PERMITTED PLAINTIFF'S MOTHER LYNN MONGIELLO TO TESTIFY AT TRIAL WHEN PLAINTIFF NEVER NAMED HER MOTHER AS A POTENTIAL TRIAL WITNESS, OR WHAT THE SUBSTANCE OF HER TESTIMONY WOULD BE.

IV. AFTER THE TRIAL COURT IMPROPERLY PERMITTED PLAINTIFF'S MOTHER TO TESTIFY, LYNN MONGIELLO THEN PROCEEDED TO GIVE A SUBSTANTIAL AMOUNT OF INADMISSIBLE HEARSAY

7

AND "MEDICAL OPINION" TESTIMONY ABOUT CONCUSSIONS, DEPRESSION, PERSONALITY DISORDERS AND PAIN LEVELS, WHICH PLAINTIFF'S COUNSEL CLAIMED WERE JUST "MOM OPINIONS."

V. A NEW TRIAL IS WARRANTED BECAUSE PLAINTIFF, PLAINTIFF'S MOTHER AND PLAINTIFF'S COUNSEL TOLD THE JURY THAT PLAINTIFF IS INCAPABLE OF WORKING AS A CHEF WITHOUT ANY MEDICAL OR VOCATIONAL EXPERT TESTIMONY.

VI. A NEW TRIAL IS WARRANTED BECAUSE, IN A DAMAGES-ONLY TRIAL, IT WAS IMPROPER AND HIGHLY PREJUDICIAL FOR PLAINTIFF'S COUNSEL TO STATE IN HIS OPENING, AND FOR PLAINTIFF AND HER MOTHER TO TESTIFY, THAT PLAINTIFF WAS ON HER WAY TO SEE HER UNITED STATES MARINE CORPS BOYFRIEND WHO WAS HOME ON LEAVE FROM CAMP LEJEUNE IN NORTH CAROLINA WHEN THE ACCIDENT OCCURRED.

VII. A NEW TRIAL IS WARRANTED BECAUSE THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT PERMITTED DR. DWYER TO OPINE ABOUT FUTURE NECK SURGERY WHEN HIS REPORT ONLY STATES THAT THE SPECULATIVE FUTURE SURGERY IS A "POSSIBILITY," WHICH THEN ESCALATED TO A POINT WHERE PLAINTIFF'S COUNSEL IMPERMISSIBLY STATED IN CLOSING THAT PLAINTIFF

8

"WILL ABSOLUTELY REQUIRE THE SURGERY."

VIII. AFTER IMPROPERLY ALLOWING DR. DWYER TO TESTIFY ABOUT THE "POSSIBILITY" OF A SPECULATIVE FUTURE SURGERY, THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT PERMITTED DR. DWYER TO SHOW A GORY AND PREJUDICIAL VIDEO OF A CERVICAL FUSION SURGERY, WHICH PLAINTIFF'S COUNSEL ADMITTED DURING SUMMATION "WAS NOT EASY TO WATCH."

IX. A NEW TRIAL IS WARRANTED BECAUSE PLAINTIFF'S EXPERT, DR. DWYER, PROVIDED INADMISSIBLE BOOTSTRAP HEARSAY TESTIMONY THAT HIS READING OF THE MRIS WAS CONSISTENT WITH THE NON-TESTIFYING RADIOLOGIST WHO WROTE THE MRI REPORT.

X. A NEW TRIAL IS WARRANTED BECAUSE THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT PERMITTED PLAINTIFF TO ADMIT PHOTOGRAPHS OF PLAINTIFF COOKING WITH HER GRANDMOTHER AND PLAYING LACROSSE THAT WERE NOT PRODUCED DURING DISCOVERY.

XI. A NEW TRIAL IS WARRANTED BECAUSE THE CUMULATIVE EFFECT OF THESE ERRORS RESULTED IN AN UNFAIR TRIAL TO DEFENDANT.

9

XII.  A NEW TRIAL IS WARRANTED BECAUSE
PLAINTIFF'S VERDICT OF $1,800,000 WAS
AGAINST THE WEIGHT OF THE EVIDENCE
AND SHOCKS THE CONSCIENCE.

As noted in the point headings for her arguments, defendant's overarching claim is that the judge erred by denying her motion for a new trial or, in the alternative, for remittitur.  In addressing these contentions, we recognize the fundamental principle that jury trials are a bedrock part of our system of civil justice and that the factfinding functions of a jury deserve a high degree of respect and judicial deference.  See, e.g., Caldwell v. Haynes, 136 N.J. 422, 432 (1994).  In terms of its assessment of the relative strength of the proofs, a jury verdict is "impregnable unless so distorted and wrong, in the objective and articulated view of a judge, as to manifest with utmost certainty a plain miscarriage of justice."  Doe v. Arts, 360 N.J. Super. 492, 502-03 (App. Div. 2003) (quoting Carrino v. Novotny, 78 N.J. 355, 360 (1979)).

Rule 4:49-1(a) provides that a trial judge shall grant a new trial if, "having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law."  Jury verdicts are thus "entitled to considerable deference and 'should not be overthrown except upon the basis of a carefully reasoned and factually supported (and articulated) determination, after canvassing the record

10 A-5574-16T4

and weighing the evidence, that the continued viability of the judgment would constitute a manifest denial of justice.'" Risko v. Thompson Muller Auto. Grp., Inc., 206 N.J. 506, 521 (2011) (quoting Baxter v. Fairmont Food Co., 74 N.J. 588, 597-98 (1977)).

"The preeminent role that the jury plays in our civil justice system [also] calls for judicial restraint in exercising the power to reduce a jury's damages award." Cuevas v. Wentworth Grp., 226 N.J. 480, 485 (2016). Thus, "[a] court should not grant a remittitur except in the unusual case in which the jury's award is so patently excessive, so pervaded by a sense of wrongness, that it shocks the judicial conscience." Ibid.

In reviewing a trial judge's decision on a motion for a new trial, we view the evidence in the light most favorable to the party opposing the new trial motion. Caldwell, 136 N.J. at 432. Moreover, we give substantial deference to the trial judge, who observed the same witnesses as the jurors, and who developed a "feel of the case." See, e.g., Carrino, 78 N.J. at 361; Baxter, 74 N.J. at 600; Dolson v. Anastasia, 55 N.J. 2, 6 (1969).

With regard to defendant's contentions concerning the judge's evidentiary rulings, our standard of review is also well settled. "When a trial court admits or excludes evidence, its determination is 'entitled to deference absent a showing

of an abuse of discretion, i.e., [that] there has been a clear error of judgment.'" Griffin v. City of E. Orange, 225 N.J. 400, 413 (2016) (alteration in original) (quoting State v. Brown, 170 N.J. 138, 147 (2001)). "Thus, we will reverse an evidentiary ruling only if it 'was so wide [of] the mark that a manifest denial of justice resulted.'" Ibid. (quoting Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492 (1999)).

A determination on the admissibility of expert evidence is likewise committed to the sound discretion of the trial court. Townsend v. Pierre, 221 N.J. 36, 52 (2015) (citing State v. Berry, 140 N.J. 280, 293 (1995)). A trial court's grant or denial of a motion to preclude expert testimony is entitled to deference on appellate review. Ibid. As instructed by the Supreme Court, "we apply [a] deferential approach to a trial court's decision to admit expert testimony, reviewing it against an abuse of discretion standard." Id. at 53 (alteration in original) (quoting Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 371-72 (2011)).

With regard to defendant's arguments concerning statements made by plaintiff's trial counsel in his closing statement to the jury, it is well settled that a summation "must be limited to the facts in evidence and inferences reasonably to be drawn therefrom." State v. Bey, 129 N.J. 557, 620 (1992). While counsel

is to be given broad latitude in summation, he or she may not misstate the evidence or distort the factual picture. Geler v. Akawie, 358 N.J. Super. 437, 467 (App. Div. 2003). Counsel is, however, permitted to argue from the evidence any conclusion which the factfinder is free to reach. Colucci v. Oppenheim, 326 N.J. Super. 166, 177 (App. Div. 1999). He or she "may draw conclusions even if the inferences . . . are improbable, perhaps illogical, erroneous, or even absurd, unless they are couched in language transcending the bounds of legitimate argument, or there are no grounds for them in the evidence." Ibid.

A reviewing court evaluates challenged remarks not in isolation but in the context of summation as a whole. State v. Atwater, 400 N.J. Super. 319, 335 (App. Div. 2008) (citing State v. Carter, 91 N.J. 86, 105 (1982)). Also, the challenged remarks are to be "viewed in the context of the entire record." Bey, 129 N.J. at 622. Furthermore, comments in summation do not warrant a new trial unless they "are so prejudicial that 'it clearly and convincingly appears that there was a miscarriage of justice under the law.'" Bender v. Adelson, 187 N.J. 411, 431 (2006) (quoting R. 4:49-1(a)).

Having considered defendant's contentions in light of these principles, we conclude that her arguments are without sufficient merit to warrant extensive

discussion in a written opinion. R. 2:11-3(e)(1)(E). We therefore affirm substantially for the reasons stated by the trial judge in connection with the rulings involved in this appeal. We add the following comments.

Contrary to defendant's argument in Point I, the judge properly handled her contention that the jury heard plaintiff's attorney state that "[t]his defendant has nothing to do with the verdict and there's an insurance carrier involved in this case," during a sidebar conference the judge conducted concerning plaintiff's objection to defendant's opening statement. As soon as defendant's attorney alleged that the jury heard the brief remark, the judge excused the jury. During the argument that followed, plaintiff's attorney requested that the judge ask the jurors if any of them heard the sidebar conversation. Defendant did not object. In response to the judge's question, none of the jurors raised their hand indicating they heard the comment. The judge also gave a strong curative instruction, directing the jury that

> to the extent that anybody did [hear any of the comments made during the sidebar] . . . [y]ou should disregard anything that you heard. It's not evidence in this case. It's not part of your deliberations. It's just discussions between the attorneys and the [c]ourt on some legal issues that we've been able to hash out while you were in the jury room.

Under these circumstances, the judge properly denied defendant's motion for a new trial.  Even if a juror heard the reference to insurance, the judge specifically instructed the jurors to disregard anything they may have heard.  The jury is presumed to have followed that instruction.  State v. Feaster, 156 N.J. 1, 65 (1998); State v. Manley, 54 N.J. 259, 270 (1969); see also State v. T.J.M., 220 N.J. 220, 237 (2015) (appellate courts "act on the belief and expectation that jurors will follow the instructions given them by the court").

In addition, while "[i]nappropriate efforts of counsel to make the jury aware of irrelevant and prejudicial facts surrounding insurance coverage have long been criticized by our courts[,]" a single, fleeting reference to "insurance coverage" or "an insurance carrier," as allegedly occurred here, is not reversible error.  Krohn v. N.J. Full Ins. Underwriters Ass'n, 316 N.J. Super. 477, 481-82 (App. Div. 1998).  "So long as the insurance is not featured or made the basis at the trial for an appeal to increase or decrease the damages, the information would seem to be without prejudice."  Runnacles v. Doddrell, 59 N.J. Super. 363, 368 (1960) (quoting Odegard v. Connolly, 1 N.W.2d 137, 139 (Minn. 1941)).  That was certainly the case here and, therefore, we reject defendant's argument on this point.

In Point II, defendant argues for the first time that plaintiff's attorney improperly stated in his summation that plaintiff's injury was a "death sentence," and that this comment was inflammatory and prejudicial. We disagree.

Counsel is permitted to argue from the evidence any conclusion which the factfinder is free to reach. Colucci, 326 N.J. Super. at 177. As previously noted, comments made during summation do not warrant a new trial unless they "are so prejudicial that 'it clearly and convincingly appears that there was a miscarriage of justice under the law.'" Bender, 187 N.J. at 431 (quoting R. 4:49-1(a)). Where, as here, a party fails to object to an opposing party's remarks during argument to the jury, the remarks will generally not be deemed prejudicial. State v. Timmendequas, 161 N.J. 515, 576 (1999).

Contrary to defendant's contention, plaintiff's attorney's comment directly referenced Dr. Snelling's trial testimony, where the expert opined that plaintiff had suffered a serious injury. The doctor stated, "It's a damage to the disc. Once you . . . tear the . . . lining of the disc, it's basically a death sentence for the disc when the material starts to leak out because that material will never go back into the disc." Under these circumstances, the attorney's statement that the "death sentence for [plaintiff's] spinal disc" was also "a death sentence for the way she

was living her life" was a fair comment on the evidence presented to the jury at trial.

We also reject defendant's argument in Point III that plaintiff's mother should not have been permitted to testify. While plaintiff did not specifically identify Lynn as a witness by name, she did state in her discovery responses that her "family members and friends" were potential witnesses, and she provided Lynn's name and contact information during her deposition. Moreover, there was no prejudice to defendant because Lynn's testimony was virtually identical to that provided by plaintiff. Under these circumstances, defendant was not unfairly surprised or prejudiced when Lynn took the stand to support her daughter. Therefore, the judge did not err in allowing her testimony. Glowacki v. Underwood Mem'l Hosp., 270 N.J. Super. 1, 13 (App. Div. 1994).

Defendant's argument in Point IV that Lynn's testimony was inadmissible hearsay, and also constituted improper expert medical testimony, also lacks merit. As already noted, Lynn's testimony about plaintiff's complaints, and the negative impact the accident had on all aspects of her life, essentially mirrored her daughter's account, and was based upon her own direct observations of plaintiff. Thus, Lynn's testimony was appropriate under Rule 701, which states that a non-expert witness may nevertheless give testimony in the form of

opinions where the testimony is "rationally based on the perception of the witness and . . . will assist in understanding the witness' testimony or in determining a fact in issue."

Turning to Point V, defendant argues that plaintiff, Lynn, and plaintiff's attorney should have been barred from discussing plaintiff's dream of becoming a chef because plaintiff did not present any medical or vocational expert testimony to support plaintiff's assertion that she could no longer do so. However, we agree with the trial judge, who found that because plaintiff was not "making an economic claim" for lost wages or other economic loss, an expert was not necessary. This was so because plaintiff's and Lynn's testimony, and plaintiff's attorney's comments concerning it, were only presented to support plaintiff's claim for loss of enjoyment of life. Thus, the judge did not err in allowing plaintiff and Lynn to testify about plaintiff's love of cooking and her belief that she could no longer pursue that career path.

Defendant complains for the first time on appeal in Point VI that plaintiff should not have been permitted to testify that she on her way to pick up her boyfriend, who was in the Marines, at the time of the accident. Defendant argues that this testimony "was clearly designed to elicit inadmissible sympathy for [p]laintiff." However, there was nothing improper in this brief testimony, which

was relevant to the issue of how the accident occurred. In addition, the judge instructed the jury at the end of the trial that "sympathy must play no role in your thinking and in the decision you make in the jury room." Therefore, we reject defendant's contention on this point.

We also discern no merit in defendant's argument in Point VII that the judge erred in permitting Dr. Dwyer to opine about plaintiff's need for future surgery because "his report only state[d] that the speculative future surgery was a 'possibility[.]'" The judge correctly found Dr. Dwyer's testimony "was a natural extension from the opinion, even though outside the four corners of the expert report."

In Point VIII, defendant unpersuasively argues that the judge erred in allowing plaintiff's attorney to play a "gory and prejudicial" video[5] of a cervical fusion surgery to the jury. However, the judge reviewed the video, and found "it's far from gory[.]" Thus, we have no basis for disturbing the judge's evidentiary ruling on this point.

During his testimony, Dr. Dwyer stated, "I believe my report also represented what was the actual report of the radiologist that I read." In Point IX, defendant argues for the first time on appeal that this testimony was

---

[5] Plaintiff has not provided us with a copy of this video.

impermissible hearsay "as it apprised the jury of the opinions of complex medical diagnosis of the non-testifying radiologist." However, we detect no plain error in the admission of this brief testimony. R. 2:10-2. Although the doctor made this comment, plaintiff's attorney did not solicit it, and did not subsequently comment on it. Under these circumstances, we are unable to conclude that the expert's statement was "clearly capable of producing an unjust result." Ibid.

In Point X, defendant argues that the judge erred by allowing plaintiff to introduce a photograph of plaintiff playing lacrosse and another photograph of her cooking with her grandmother because neither photograph was produced during discovery. We agree with the judge that there was no prejudice to defendant by permitting the use of the two photographs because they were consistent with the information plaintiff provided during discovery concerning her participation in lacrosse in high school and her love of cooking. Thus, there was no intent to mislead or conceal information from defendant, and no surprise or prejudice to the defense. Clearly, this was not the type of serious discovery violation that would warrant preclusion of the photographs. Manorcare Health Servs., Inc. v. Osmose Wood Preserving, Inc., 336 N.J. Super. 218, 235 (App. Div. 2001).

In Point XI, defendant argues that the "cumulative effect" of the alleged errors raised by her on appeal "resulted in an unfair trial." Having rejected defendant's contention that any reversible error occurred during his trial, we also reject his cumulative error argument.

Finally, we discern no basis for disturbing the trial judge's denial of defendant's motion for a new trial or remittitur. Viewing the evidence in the light most favorable to plaintiff, it is clear that the jury verdict of $1,800,000 does not shock the judicial conscience. Plaintiff presented ample evidence that she sustained a serious permanent injury. She was nineteen when the accident occurred, and had a life expectancy at that time of 60.4 years. Plaintiff testified that as a result of her injury, she was in constant pain. This pain has persisted despite medication, PT, pain management, and a spinal epidural injection. She will likely need spinal surgery in the future. These conditions altered plaintiff's prior lifestyle and her enjoyment of life. She was not as active and social as she was prior to the accident, and she felt she had to abandon her lifelong dream of becoming a chef.

Accordingly, we are unable to conclude that the jury verdict resulted in a miscarriage of justice as required by Rule 4:49-1(a). Therefore, we reject defendant's contention on this point.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-5574-16T4