

# TAX COURT OF NEW JERSEY

JOSHUA D. NOVIN
Judge

Morris County Courthouse
Washington & Court Streets
1st Floor, P.O. Box 910
Morristown, New Jersey 07963
Tel: (609) 815-2922, Ext. 54680
Fax (862) 397-5690

## NOT FOR PUBLICATION WITHOUT THE APPROVAL
## OF THE TAX COURT COMMITTEE ON OPINIONS

February 11, 2021

Lawrence S. Berger, Esq.
Berger & Bornstein, LLC
237 South Street
P.O. Box 2049
Morristown, New Jersey 07962

Martin Allen, Esq.
DiFrancesco, Bateman, Kunzman,
 Davis, Lehrer & Flaum, P.C.
15 Mountain Boulevard
Warren, New Jersey 07059

> Re:  Washington Shopping Center, Inc. v. Washington Township
>      Docket Nos. 005517-2016, 002869-2017, and 006408-2018

Dear Mr. Berger and Mr. Allen:

This constitutes the court's opinion following trial of local property tax appeals filed by plaintiff, Washington Shopping Center, Inc. ("WSCI"). WSCI challenges the 2016, 2017, and 2018 tax year assessments on its improved property located in Washington Township ("Washington Township").

For the reasons stated more fully below, the court affirms the 2016, 2017, and 2018 tax year assessments.






## I.     Procedural History

### A.     Findings of Fact

WSCI is the owner of the real property and improvements located at 459-471 Route 31 South, Washington Township, Warren County, New Jersey.   The property is identified on Washington Township's municipal tax map as Block 75, Lot 1 (the "subject property").

The real property comprises a 22.84-acre rectangular shaped parcel located at the intersection of Route 31 South and County Road 632 (also known as Asbury Anderson Road).  As of the valuation dates the real property was improved with an 82,233 square foot retail shopping center constructed in 1996.  The subject property also includes a McDonald's fast-food restaurant located on a 0.9703-acre pad site and two additional undeveloped pad sites.  The site is serviced by well water and an on-site sewage treatment system/plant.   The on-site sewage treatment system/plant is located southwest of the shopping center, with the septic field adjacent thereto.  A water reservoir is located on the site to maintain sufficient water pressure for the shopping center's sprinkler system.  The site is serviced by natural gas and electric.

The subject property is located in Washington Township's HC – Highway Commercial District, permitting uses that include appliance stores, bakeries, banks, clothing stores, electronic stores, furniture stores, grocery stores, hardware stores, liquor stores, medical and dental offices, pet stores, pharmacies, restaurants, and movie theatres.[1]  The subject property is located within the Highlands Act Planning Area.[2]  The subject property is located in a rural setting, including areas

---

[1]  The Expert (as such term is hereafter defined) offered testimony that although not identified in his appraisal report, self-storage facilities are a permitted use in the HC – Highway Commercial District.

[2]  New Jersey enacted the Highlands Water Protection and Planning Act, N.J.S.A. 13:20-1 to -35 (the "Highlands Act"), to provide an apparatus for regional land use planning in areas of northern New Jersey identified as the Highlands Region.  See N.J.S.A. 13:20-7(a).






of farms, open lands, residential developments, and some commercial development. The subject property is in the X Flood Hazard Zone, denoting an area of minimal flooding risk.

WSCI timely filed complaints challenging the subject property's 2016, 2017, and 2018 tax year assessments. Washington Township timely filed a counterclaim for the 2018 tax year.

At trial, WSCI offered testimony from a State of New Jersey certified general real estate appraiser, who was accepted by the court, without objection, as an expert in the field of property valuation (the "Expert").[3]

As of each valuation date, the subject property's tax assessment, implied equalized value, and the Expert's value conclusions are set forth below:

| Valuation date | Tax Assessment | Avg. ratio assessed to true value | Implied equalized Value | WSCI's Expert's concluded value |
|---|---|---|---|---|
| 10/1/2015 | $6,438,700 | 94.19% | $6,835,864 | $3,525,000 |
| 10/1/2016 | $6,438,700 | 97.43% | $6,608,539 | $3,525,000 |
| 10/1/2017 | $6,438,700 | 98.35% | $6,546,721 | $3,525,000 |

When initially constructed in 1996, the shopping center was designed to accommodate an A&P grocery store consisting of 45,190 square feet and approximately 37,043 square feet of additional retail space.[4] According to the Expert, the subject property has historically experienced "issues of vacancies," and "poor economic performance." In his estimation, the permanent closure of the A&P store in December 2015 "impacted the financial feasibility and the future continuation of this retail center." During the tax years at issue, the subject property experienced the following vacancy rates: (i) 25%, as of the October 1, 2015 valuation date (82,233 sq. ft./20,220 sq. ft. =

---

[3] The defendant stipulated as to the Expert's qualifications.
[4] A portion of the 37,043 square feet comprises a building depth of 154 feet and was initially designed for occupancy by a Walgreens pharmacy, however Walgreens never took possession of the space. The remainder of the 37,043 square feet comprises a building depth of 100 feet.


Interpreter


ADA
Americans with
Disabilities Act


ENSURING
AN OPEN DOOR TO
JUSTICE



24.5%); (ii) 80%, as of the October 1, 2016 valuation date (82,233 sq. ft./65,410 sq. ft. = 79.5%);

and (iii) 89%, as of the October 1, 2017 valuation date (82,233 sq. ft./72,914 sq. ft. = 88.66%).[5]

The subject property is located less than one mile from a shopping center containing a Shop

Rite grocery store constructed approximately "ten [to] fifteen years ago" that, in the Expert's

opinion, "has had a negative impact on the subject [property]." The Expert offered that due to the

"locational characteristics" and "because of changing retail habits and because of the

demographics, . . . this center has been severely impacted by the loss of the A&P. And in my

opinion . . . it's not something that can be fixed . . . it is a market concern that has substantially

affected this center." In the Expert's opinion the subject property has been experiencing some

physical obsolescence for several years and the costs that would have to be expended by the

property owner to secure new tenants for the former A&P space "will probably likely exceed any

rent they could collect over ten years or a reasonable holding period, and that further diminishes

the viability of this center."

Specifically, the Expert opined that due to the depth of a portion of the buildings, between

154 and 184 feet, in-line retailers find "that's just too much space, it's too deep." Thus, he

concluded that these portions of the buildings in the shopping center are "non-rentable space,"

"obsolete" and have "no economic value." In the Expert's opinion "you'd have to subdivide that

space off because your in-line tenants can't use that." In sum, the expert found that 49,769 square

feet of the shopping center is "non-useable space," to which he ascribed no value.[6] However, the

---

[5] In the Expert's opinion, "as of October 1, 2015 everybody knew that [A&P] were going into bankruptcy. This was the end of A&P. . . ." Thus, the Expert ascribed an 81% vacancy rate to the subject property as of the October 1, 2015 valuation date, even though A&P remained in possession and continued operations in the subject property until December 2015.

[6] Under his income capitalization approach, the Expert ascribed a value to only 32,464 square feet of the shopping center (82,233 - 32,464 = 49,769 square feet).






Expert's testimony as to how he calculated this "non-useable" square footage was imprecise. The Expert offered testimony that the "non-useable" area of the subject property comprises 23,500 square feet of "front retail space" and 21,690 of "non-useable space" (84' depth x 235' width = 19,740 square feet, plus 1,950 square feet of former shipping area = 21,690). Yet, that accounts for only 45,190 square feet (23,500 + 21,690 = 45,190 square feet). Thus, the Expert apparently concluded when preparing his appraisal report that an additional 4,579 square feet of the shopping center was "non-useable."

B.     Presumption of Validity

At the close of WSCI's proofs, Washington Township moved for dismissal of these matters under R. 4:37-2(b), arguing that WSCI failed to overcome the presumption of validity that attaches to the local property tax assessments. See Pantasote Co. v. City of Passaic, 100 N.J. 408, 413 (1985); Riverview Gardens v. North Arlington Borough, 9 N.J. 167, 174 (1952)); Little Egg Harbor Twp. v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998); MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J. Tax 364, 373 (Tax 1998).

According WSCI all reasonable and legitimate inferences which could be deduced from the evidence presented, the court concluded that WSCI produced cogent evidence sufficient to overcome the presumption of validity. If accepted as true, the opinions of the Expert and the facts upon which the Expert relied raised debatable questions regarding the correctness of the subject property's local property tax assessments for the 2016, 2017, and 2018 years. MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376. Accordingly, the court denied Washington Township's motion and placed a statement of reasons on the record.






Following denial of its motion, Washington Township notified the court that under R. 8:3-9, it was withdrawing its counterclaim for the 2018 tax year.[7] Additionally, Washington Township advised the court that it was resting, without introducing or offering any proofs or evidence in these matters, including any testimony from its proposed testifying expert.

The court then assigned dates for submission of post-trial briefs and reply briefs. WSCI's counsel then raised the prospect of seeking to compel testimony from Washington Township's proposed testifying expert, as a rebuttal witness. Although no testimony or evidence had been offered by Washington Township in defense of the subject property's local property tax assessments, WSCI's counsel argued that he should be permitted to compel testimony from Washington Township's proposed testifying expert. Washington Township objected to WSCI's request. Accordingly, the court afforded the parties an opportunity to submit written briefs addressing the matter.

On April 9, 2019, the court delivered a written opinion concluding that WSCI could not compel the testimony of Washington Township's proposed testifying expert against the proposed testifying expert's wishes, or without his consent. In addition, the court declined to permit WSCI to offer rebuttal testimony when Washington Township failed to offer any affirmative evidence. The court declined to reopen the trial record in these matters and set down dates for the submission of post-trial briefs.

C.    Adverse Inference[8]

In its post-trial brief WSCI asserts that it is "entitled to an adverse inference with regard to the support that defendant[']s appraisal and appraiser would have for plaintiff [WSCI's]

---

[7]  No counterclaims were filed by Washington Township for the 2016 or 2017 tax years.
[8]  In its post-trial reply brief, WSCI refers to the adverse inference charge as a "negative inference."






evidence."[9]  Specifically, WSCI asks the court to "draw an adverse inference from [Washington Township's] failure to call its [proposed testifying] expert as a witness to refute [WSCI's Expert's] determinations and his conclusion as to the fair market value of the subject property."

In response, Washington Township maintains that it would be impermissible for the court to draw an adverse inference from its decision to rest and not offer any evidence in these matters, including without limitation, soliciting testimony from its proposed testifying expert.

"When 'a party fails to produce a witness who is within its power to produce and who should have been produced,' the adverse inference rule permits the factfinder 'to infer that the witness's evidence is unfavorable to the party's case." Washington v. Perez, 219 N.J. 338, 352 (2014) (quoting Black's Law Dictionary, 62 (9th ed. 2009)).  Thus, when it is within the power of a party to produce a witness whose testimony would be meaningful and provide clarity regarding issues presented, the rule permits the factfinder to presume that the testimony would have been harmful.  See Graves v. United States, 150 U.S. 118, 121 (1893); State v. Clawans, 38 N.J. 162 (1962); Maul v. Kirkman, 270 N.J. Super. 596 (App. Div. 1994).

However, in New Jersey our courts have historically applied the adverse inference rule with a measure of caution, requiring trial courts to adhere to a procedure requiring a "case-specific

---

[9]  WSCI argues in its post-trial brief that it sought the opportunity to "put parts of [Washington Township's proposed testifying expert's] appraisal into evidence since his appraisal supported a number of [WSCI's Expert's] findings and he was present in the courtroom."  However, the court emphasizes that in support of its argument to compel testimony from Washington Township's proposed testifying expert, WSCI did not place any limitations on the scope of the expert testimony or evidence that it would solicit.  Instead, WSCI argued that it had anticipated it "would have the opportunity to cross-examine Mr. Raymond and elicit testimony as to his expert report," and that "[s]ince Mr. Raymond's appraisal report unequivocally corroborated Mr. Manzione's testimony. . . . Mr. Raymond's testimony will be helpful to the court is assessing the weight to be given to Mr. Manzione's determinations in finding the true value of the property."  See WSCI's February 22, 2019 letter brief.






analysis," and consideration of the potential prejudice and likelihood to "mislead or confuse the jury," in gauging whether an adverse inference charge is warranted. See Washington, 219 N.J. at 353-357; State v. Hill, 199 N.J. 545, 561 (2009); State v. Velasquez, 391 N.J. Super. 291, 306 (App. Div. 2007). This procedure and analysis mandates that the party seeking the adverse charge notify the adversary and the court of the name of the witness not called, and who has "superior knowledge of relevant facts." State v. Hill, 199 N.J. at 561. Moreover, the trial court must make specific factual findings on the record whether the witness is "peculiarly within the control or power of only the one party"; the witness' availability to that party "both practically and physically"; and that the "testimony of the uncalled witness will elucidate relevant and critical facts in issue." Id. at 561-562.

Importantly, our Supreme Court has drawn a distinction between affording an adverse inference charge with respect to fact witness testimony and expert testimony. Recognizing the "significant distinctions" that exist between fact witness and expert witness testimony, the Court observed that our court rules afford litigants broad discovery rights with respect to the opinions of expert witnesses, in contrast to those of fact witnesses. Washington, 219 N.J. at 361. The Court highlighted that because an expert is required to set forth the factual bases supporting the expert's opinion, "an expert is unlikely to be in exclusive possession of factual evidence that would justify an adverse inference charge." Ibid. Thus, "[r]arely will an expert be in a position to reveal previously undisclosed factual information, for the first time, on the stand at trial." Id. at 362. Therefore, it will be an "unusual setting" when a party decides "not to call an expert witness . . . prompted by the party's fear that the expert will reveal unfavorable facts that would otherwise not be disclosed." Ibid.

   

Moreover, the Court emphasized that giving an adverse inference charge because of the failure of a party to call an expert witness would be inconsistent with our court rules which "do not compel a litigant who has disclosed the name and opinion of a particular expert to call that expert to testify at trial." Ibid. Finally, the Court highlighted that during a trial there are "many strategic and practical reasons that may prompt a party who has retained an expert witness to decide not to present the expert's testimony . . . a party may decide against calling a particular expert at trial to save resources . . . [a]n expert's testimony may no longer be relevant because a previously contested issue has been resolved. . . ." Id. at 363. Thus, the Court reasoned, there may be "many explanations for a party's decision not to call a particular expert that may have nothing to do with a party's fear that the expert will reveal prejudicial information." Ibid. Accordingly, the Court concluded that an adverse inference charge "will rarely be warranted when the missing witness is not a fact witness, but an expert." Id. at 364.

Here, WSCI argues that because Washington Township elected not to offer testimony from its proposed testifying expert the court should infer that the expert would have offered testimony favorable or supportive of WSCI's Expert's value conclusions and opinions. Specifically, WSCI asserts that had Washington Township's expert testified during trial, he may have offered testimony "supportive of [WSCI's] conclusions on some issues." However, WSCI does not contend, nor has it effectively demonstrated that Washington Township's expert possessed a "superior knowledge of relevant facts" in these matters. The mere possibility that an expert may have offered testimony supportive to the conclusions of another expert, had the expert testified during trial, does not warrant application of an adverse inference. WSCI offered no evidence that Washington Township's proposed testifying expert witness possessed superior knowledge of facts






related to the subject property and that his testimony would have elicited more meaningful insight into that information than WSCI's Expert offered.

Significantly, WSCI was made aware, prior to commencement of trial, of both the factual bases and conclusions reached by Washington Township's proposed testifying expert, when the parties exchanged discovery and appraisal reports. Thus, in advance of trial Washington Township disclosed to WSCI, and WSCI was afforded the opportunity to discover any alleged "superior" facts known by Washington Township's proposed testifying expert witness probative to the subject matter in these local property tax appeal actions.

Additionally, as expressed by the court in its April 9, 2019 letter opinion, in New Jersey "a party cannot compel the testimony of an adversary's proposed testifying expert unless the expert has consented to offering such expert opinion testimony." Thus, permitting the factfinder to apply an adverse inference based on a litigant's knowing and willful trial strategy, or by virtue of a party's selection during trial from multiple sources of expert testimony, would run afoul of those principles. As cogently expressed by our Appellate Division, in local property tax appeal matters the appealing party shoulders "the burden of proving [that] the assessment erroneous. The evidence necessary to overcome the presumption of validity must be 'definite, positive and certain in quality and quantity' . . . [the taxing district] 'was under no legal obligation to shore up the weaknesses in plaintiff's proofs by the presentation of independent evidence of value.'" Glenpointe Associates v. Teaneck Twp., 12 N.J. Tax 118, 123 (App. Div. 1990).

Thus, applying the criteria and considerations expressed by the Court in Washington v. Perez, the court finds that Washington Township's failure to present expert witness testimony and independent evidence of market value does not warrant an adverse inference charge.






    D.   Trial record

Annexed to the certification of WSCI's counsel, in support of its post-trial brief, are copies of Washington Township's proposed testifying expert's appraisal report and copies of tax bills and farmland assessment applications. In its post-trial brief, WSCI's counsel highlights portions of the value conclusions reached by Washington Township's proposed testifying expert in his appraisal report, which report was not part of the trial record. Moreover, WSCI's post-trial brief requests the court "take judicial notice of the farmland assessment of the 34 acre [adjacent] farmland-assessed parcel. . . . ," which property was not the subject matter of these local property tax appeals and which documents were not made part of the trial record.

Washington Township objects to "the references [contained] throughout plaintiff's [post-trial] brief to defendant's expert's appraisal report which was not introduced into evidence. . . ." Additionally, Washington Township objects to "the submission of Exhibits C [Application for Farmland Assessment and tax bills] and D [Washington Township's proposed testifying expert's appraisal report] to [WSCI's counsel's] Certification, neither of which was in evidence at trial."

It is well-settled principle that counsel is afforded "broad latitude in summation." Colucci v. Oppenheim, 326 N.J. Super. 166, 177 (App. Div. 1999); Hayes v. Delamotte, 231 N.J. 373, 387-388 (2018); Diakamopoulos v. Monmouth Med. Cen., 312 N.J. Super. 20, 32 (App. Div. 1998); Condella v. Cumberland Farms, Inc., 298 N.J. Super. 531, 534 (Law Div. 1996). However, that latitude is not without its reasonable limits, and a counsel's "comments must be confined to the facts shown or reasonably suggested by the evidence introduced during the course of the trial." Ibid. (Emphasis added); see also Spedick v. Murphy, 266 N.J. Super. 573, 590 (App. Div.), certif. denied, 134 N.J. 567 (1993). "[C]ounsel may draw conclusions even if the inferences that the jury is asked to make are improbable, perhaps illogical, erroneous or even absurd, unless they are

   

couched in language transcending the bounds of legitimate argument, or there are no grounds for them in the evidence." Colucci, 326 N.J. Super. at 177. "Within those limits, however, '[c]ounsel may argue from the evidence any conclusion which a jury is free to reach.'" Hayes, 231 N.J. at 387-388.

Significantly, in New Jersey, "[i]t is error to rest a decision on matters not appearing in the record." Second Reformed Church v. Board of Adjustment of Borough of Freehold, 30 N.J. Super. 338 (App. Div. 1954). A judge is "governed by the principle of the exclusiveness of the record," thus, the court must base its decisions on the trial record, and not information personally known to the judge, or information that may have been disclosed outside of the trial record. Morris County Land Improv. Co. v. Parsippany-Troy Hills, 40 N.J. 539, 549 (1963); see also Giordano v. City Com. of Newark, 2 N.J. 585 (1949).

Here, in lieu of summation or closing arguments, the court afforded WSCI's counsel and Washington Township's counsel the opportunity to submit post-trial briefs. Thus, WSCI's counsel's post-trial brief, certification, and exhibits to the certification are the functional equivalent of their summation or closing arguments in these matters. Accordingly, the arguments offered by WSCI's counsel must be confined to the facts disclosed in the trial record, or those that were reasonably suggested by the evidence introduced during trial. Washington Township's proposed testifying expert's appraisal report was not made part of the trial record in these matters and the conclusions and opinions contained therein were not reasonably suggested by the evidence. Additionally, the opinions and/or conclusions reached by Washington Township's proposed testifying expert in his appraisal report were not part of the trial record. Therefore, because Washington Township's proposed testifying expert's appraisal report, including the statements and conclusions reached therein, were not part of the trial record and were not reasonably






suggested by the evidence, the court will not consider those documents and any statements or conclusions reached therein as evidence in deciding these matters.

However, the court observes that during cross-examination the Expert disclosed that "there is a farmland qualified piece that does add about another 30 plus acres to the site." Moreover, Washington Township's counsel methodically cross-examined the Expert regarding the subject property's zoning and that "part of the property which is now farmland," inquiring whether the Expert made any inquiry into "developing the farmland area into [a] residential" subdivision. Additionally, the Expert's appraisal report, admitted into evidence as P-1, delineates the subject property's local property tax assessment, Washington Township's applicable tax rate, and the subject property's local property taxes for the 2016, 2017, and 2018 tax years. Thus, insofar that WSCI's counsel's certification or briefs contains or avers to the Applications for Farmland Assessment for the 2016, 2017, and 2018 tax years, and copies of Washington Township's tax bills for the subject property and the farmland assessed property for the 2016, 2017, and 2018 years, the court will afford WSCI's counsel's deference and latitude in his summation papers, as such information was reasonably suggested by the evidence introduced during trial.

## II.   Conclusions of Law

Having concluded that WSCI presented evidence sufficient to overcome the presumption of validity that attaches to the local property tax assessment, does not inexorably lead the court to the conclusion that the subject property's tax assessments are erroneous. Once the presumption has been overcome, "the court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co. v. Edison Twp., 127 N.J. 290, 312 (1992). The court must be mindful that "although there may have been enough evidence [presented] to overcome the presumption of correctness at






the close of [the plaintiff's] case-in-chief, the burden of proof remain[s] on the [plaintiff] . . . to demonstrate that the judgment [or local property tax assessment] under review was incorrect." Id. at 314-15.

    A.    Highest and Best Use

In the court's pursuit to determine the true value of the subject property, consideration must be given to that price which a hypothetical buyer would pay a hypothetical seller, neither of which are constrained to purchase or sell the property, as of October 1 of the pretax year. See Petrizzo v. Borough of Edgewater, 2 N.J. Tax 197, 200 (Tax 1981); Genola Ventures v. Shrewsbury Borough, 2 N.J. Tax 541, 551 (Tax 1981). An indispensable element to the process of property valuation and to the determination of a property's true market value is discerning its highest and best use. Ford Motor Co., 127 N.J. 290 (1992). "For local property tax assessment purposes, property must be valued at its highest and best use." Entenmann's Inc. v. Totowa Borough, 18 N.J. Tax 540, 545 (Tax 2000). Thus, the highest and best use analysis is often referred to as "the first and most important step in the valuation process." Ford Motor Co. v. Edison Twp., 10 N.J. Tax 153, 161 (Tax 1988).

The highest and best use analysis comprises the "sequential consideration of the following four criteria, determining whether the use of the subject property is: 1) legally permissible; 2) physically possible; 3) financially feasible; and 4) maximally productive." Clemente v. Twp. of South Hackensack, 27 N.J. Tax 255, 267-269 (Tax 2013), aff'd, 28 N.J. Tax 337 (App. Div. 2015). See also County of Monmouth v. Hilton, 334 N.J. Super. 582, 588 (App. Div. 2000).

However, the highest and best use of a property is not a static principle. The highest and best use of a property may alter over time with a market that is in transition, or because of changes in the economic climate, zoning, or from the presence or lack of development. When engaging in






a highest and best use analysis the appraiser must interpret "the market forces that affect the subject property and identify[] the use or uses on which the final opinion of value is based." Appraisal Institute, <u>The Appraisal of Real Estate</u>, 42 (14th ed. 2013). An appraiser must closely examine the parcel being appraised "for all possible uses and that use which will yield the highest return should be selected." <u>Inmar Associates, Inc. v. Edison Twp.</u>, 2 N.J. Tax 59, 64 (Tax 1980).

In arriving at a conclusion of a property's highest and best use, the "focus of [the] highest and best use analysis is on the potential uses of the land as though vacant. In practice, however, the contributory value of the existing improvements and any possible alteration of those improvements are just as important in determining highest and best use and . . . in developing an opinion of the market value of the property." <u>The Appraisal of Real Estate</u> at 337.

> [A]n appraiser needs to test whether the existing improvements contribute value, rather than simply assume that the current use is the highest and best use because the improvements are already in place. . . . <u>Demolition of improvements can be considered the most extreme form of modification to the current use of the property as improved. If the value of the property as improved is greater than the value of the site as though vacant less demolition costs, the existing improvements contribute value to the property's highest and best use, and the improvements should not be demolished at that time.</u> When the improvements no longer contribute to value, demolition and redevelopment of the ideal improvement would be economically supportable.
>
> [<u>The Appraisal of Real Estate</u>, at 346 (Emphasis added).]

1. <u>As Improved</u>

The Expert concluded that the highest and best use of the subject property, as improved, and to "reduce operating costs, including maintenance, taxes, insurance and other items . . . is to demolish the former A&P portion of the facility." In reaching that conclusion the Expert indicated that he examined the subject property's historical vacancy rates, and the vacancy rates of the






shopping centers comprising his comparable leases. After performing that analysis, the Expert reached the conclusion that it is "not financially feasible" to maintain the A&P space, and that it should be razed rather than attempting to refit it and subdivide it.[10] The Expert explained that "considering the physical deficiencies of the [property] . . . the highest and best use [as improved] is to demolish the A&P space and then you're really left with just in-line retail that can serve the local market where the type of ma and pop user would go to that center." In the Expert's opinion, "the market's not going to absorb this space [so] there's no point in having it." Therefore, the Expert concluded that the highest and best use of the subject property, as improved, is as a neighborhood strip retail center with demolition of the existing A&P space.

However, the court finds the Expert's concluded highest and best use analysis of the subject property, as improved, flawed and not credible. The Expert opines that it would be more financially advantageous for WSCI to reduce its overhead and expenses by demolishing 49,769 square feet of leasable area in the shopping center, or approximately 61% of the shopping center (49,769 sq. ft./82,233 sq. ft. = 60.52%), because of what he characterizes as a perceived inability of the marketplace to absorb such retail space. In support of such proposition, the Expert offered testimony that one mid-sized retail space, approximately 50 to 60 years old, has remained vacant for an extended time. Nonetheless, the Expert then undertakes an income capitalization approach to value, relying on six comparable retail leases entered into between 2004 and 2014.[11] These six

---

[10] Although the Expert conceded that the A&P space could be subdivided and repurposed for other retail uses, he offered testimony that the cost to subdivide and repurpose the space would be between $70 to $200 per square foot. However, this testimony must be reconciled with the Expert's appraisal report, which states that the costs for "sub-dividing the space to attract smaller tenants" would be approximately "$100+/SF."

[11] The Expert's appraisal report included a total of fifteen leases ranging in size from 1,500 to 30,000 square feet. However, for reasons detailed later in the court's opinion, the court found that several leases were not credible evidence of economic rent due a number of factors, including the




Americans with Disabilities Act


ENSURING AN OPEN DOOR TO JUSTICE



comparable leases comprise mid-sized retail stores ranging in size from 7,600 to 16,934 square feet, and bear unadjusted rental rates of between $7.17 to $13.30 per square foot. Thus, despite the Expert's conclusion that it would not be "financially feasible" to subdivide the 45,190 square feet of former A&P space because the market would be unable to absorb it, his reliance on an income capitalization approach to value and six comparable leases ranging in size from 7,600 to 16,934 square feet suggests otherwise. Moreover, although the Expert opined that the market cannot absorb this type of retail space, and that the highest and best use of the subject property, as improved, would be to demolish 61% of the shopping center, the Expert was unable to identify any other shopping centers in the subject property's market area that have engaged in such wholesale demolition.

The court's conclusion is further buttressed by the Expert's testimony regarding how he computed the subdivision costs. During trial, the Expert offered testimony that in reaching his conclusion that it was not financially feasible to subdivide the A&P space, he consulted Marshall and Swift Valuation Service's cost tables to estimate the subdivision costs. According to his testimony, the tables for Neighborhood and Community Shopping Center Interior Retail Space discloses "if you look at the good space, it's $53.38 a square foot. You've got to multiply it by a local multiplier, which is about a third, 1.3. That gives you up to about $72, give or take."[12] The Expert further offered that the aforesaid calculated amount does not include interior demolition

---

dates of execution of the leases, the circumstances surrounding the execution of the leases, and locational differences between the subject property and the comparable leased property.

[12] The Marshall and Swift Valuation Service cost tables reproduced in the Appendix to the Expert's report discloses that for a Neighborhood and Community Shopping Center Interior Retail Space of "Good" quality, the cost would be $55.38 per square foot, not $53.38 per square foot. Additionally, the court is uncertain how the Expert determined the local multiplier to be applied to the base finish cost was 1.30, as no local multiplier for Washington Township or any municipality in Warren County was included in the Expert's Appendix.






costs, therefore, he opined that it would be uneconomical to incur approximately $100 per square foot to subdivide the A&P space into smaller retail space. However, during cross-examination the Expert acknowledged that his estimates for demolition and alteration of mechanicals systems were offered.

Significantly however, later during trial and in an effort to explain his estimated subdivision costs, the Expert offered that "<u>I think the best someone could hope to get at this center would be $5 a square foot for that type of space</u>" and "<u>[i]f I'm getting $5 rent and it cost me $100 [to subdivide the A&P retail space], that's a 5 percent return before making any [money] on my investment</u>. Plus, . . . it's going to take me 20 years to recoup my cost." Thus, in reaching his conclusion that the subject property's highest and best use, as improved, was demolition of 49,769 square feet of retail area he determined it was not financially feasible to subdivide, the Expert apparently attributed only a $5.00 per square foot rental value to those subdivided area, rather than his concluded economic rental value of $12.00 per square foot. Stated differently, in analyzing the financial feasibility and maximally productive uses of the subject property under the highest and best use analysis, the Expert did not apply his concluded economic rent. Instead, the Expert applied a value of $5.00 to the potential subdivided area, or approximately 40% of his concluded economic rent.

In sum, the court finds that Expert's conclusion that the subject property's highest and best use, as improved, is demolition of demolition of 49,769 square feet, or approximately 61% of the subject property's retail area not credible.

2. <u>As Vacant</u>

The Expert concluded the subject property's highest and best use, as vacant, was for "commercial use." However, in performing his highest and best use, as vacant analysis, the Expert

   

apparently did not consider the maximally productive or financially feasible criteria under the highest and best use test. Although the Expert's appraisal report detailed that "[f]inancially feasible and maximally productive uses for the site are for commercial development," his testimony revealed that he did not investigate or analyze what specific "commercial use" would produce the highest and best use of the subject property. Stated differently, the Expert did not analyze what legally permissible and physically possible commercial uses of the subject property would be both financially feasible and maximally productive. In response to Washington Township's counsel's inquiry that "[y]ou didn't go through the exercise of determining what was maximally productive and financially feasible as a . . . vacant highest and best use," the Expert responded, "Yeah. Typically[,] you're looking at what's legally permissible, and there's lots of uses there. So, it depends on the individual user's needs for that." In sum, the Expert offered no meaningful testimony or evidence as to his analysis of either the size of the improvement that could be erected on the subject property, nor did he delineate exactly what type of commercial use would be financially feasible and maximally productive.

3.    Excess and Surplus Land

The Expert's appraisal report further contains the conclusion that the "subject contains excess land for future retail development." However, effective cross-examination caused the Expert to alter this conclusion and contend that he erred in describing the land as "excess land." Rather, the Expert submitted during cross-examination that the land should be more appropriately characterized as "surplus land." While this distinction may seem inconsequential, the analysis required to be undertaken with respect to "excess land" and "surplus land" can be very different. Surplus land is the portion of the land that is unnecessary "to support the existing improvement and <u>cannot be separated from the property and sold off</u>." Appraisal Institute, <u>The Appraisal of</u>






Real Estate, 214 (13th ed. 2008) (Emphasis added). Conversely, excess land is "land beyond the normal needs of a particular use and that which is not necessary to support the existing improvements." Schimpf v. Little Egg Harbor Twp., 14 N.J. Tax 338, 343 (Tax 1994). Thus, excess land possesses a separate and distinct value, has the ability to be sold, and must be "valued at its highest and best use and added to the value of the lot currently used, in order to ascertain the value of the lot as a whole." Ibid. (citing Appraisal Institute, The Appraisal of Real Estate, 212 (10th ed. 1992)) (Emphasis added).

Here, despite the Expert having initially concluded in his appraisal report that the subject property contains excess land, the report failed to contain any analysis of the highest and best use of this land, nor did the report offer any credible evidence of the market value of the land. Moreover, in an attempt to support the conclusion in his report that the excess land had little contributory value, the Expert's report includes a land offering "[a]cross Asbury Anderson Road from the subject (with frontage on Rt 31 also), a 22.15-acre site is for sale . . ." However, a sale offering is not credible evidence of a property's true value. See New Jersey Turnpike Authority v. Bowley, 27 N.J. 549, 556 (1958); Olin Mathieson Chem. Corp. v. Paulsboro, 3 N.J. Tax 255, 262-263 (Tax 1981); Red Devil v. Union Twp., 5 N.J. Tax 1, 5 (Tax 1982); Highview Estates v. Englewood Cliffs Bor., 6 N.J. Tax 194, 213 (Tax 1983). Thus, the Expert offered no credible evidence of the value of the land.

Importantly, despite contending during cross-examination that the land should be more appropriately characterized as surplus land and not excess land, the Expert continued to express his opinion that this land attributed little value to the subject property because of the subject property's high vacancy rates. However, regardless of whether the land should be characterized as surplus land or excess land, and a highest and best use analysis performed, because the Expert






failed to present the court with any credible evidence of value, the court is unable to make a determination of its value, if any.

      B.     Approach to Value - Income Capitalization Approach

"There is no single determinative approach to the valuation of real property." 125 Monitor Street LLC v. City of Jersey City, 21 N.J. Tax 232, 237-238 (Tax 2004) (citing Samuel Hird & Sons, Inc. v. City of Garfield, 87 N.J. Super. 65, 72 (App. Div. 1965)); ITT Continental Baking Co. v. East Brunswick Twp., 1 N.J. Tax 244, 251 (Tax 1980). "There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Borough of Glen Rock, 19 N.J. Tax 366, 376 (App. Div. 2001), certif. denied, 168 N.J. 291 (2001) (internal citation omitted)). The "decision as to which valuation approach should predominate depends upon the facts of the particular case and the reaction to these facts by the experts." Coca-Cola Bottling Co. of New York v. Neptune Twp., 8 N.J. Tax 169, 176 (Tax 1986) (citing New Brunswick v. Tax Appeals Div., 39 N.J. 537 (1963)). See also WCI-Westinghouse, Inc. v. Edison Twp., 7 N.J. Tax, 610, 619 (Tax 1985), aff'd, 9 N.J. Tax 86 (App. Div. 1986).

Here, the Expert relied exclusively on the income capitalization approach to derive an opinion of the subject property's market value. When a property is income producing, the income capitalization approach is the favored method for determining the estimated value of that property. Parkway Vill. Apartments Co. v. Twp. of Cranford, 8 N.J. Tax 430 (Tax 1985), aff'd, 9 N.J. Tax 199 (App. Div. 1986), rev'd on other grounds, 108 N.J. 266 (1987); Hull Junction Holding Corp. v. Borough of Princeton, 16 N.J. Tax 68, 79 (Tax 1996). The income capitalization approach "consists of methods, techniques, and mathematical procedures that an appraiser uses to analyze a






property's capacity to generate benefits (i.e., usually the monetary benefits of income and reversion) and convert these benefits into an indication of present value." Appraisal Institute, The Appraisal of Real Estate, 439 (14th ed. 2013). As Judge Hopkins succinctly stated, in valuing a property employing the income-capitalization approach:

> the gross rental value of the property is estimated. From the estimated gross rental there is deducted a factor for possible vacancies and collection losses. This results in effective gross income. Then all the expenses involved in running the property are subtracted, resulting in net income. Net income is the money which an investor could expect to receive through an investment in the property. It is computed into a value by means of a capitalization rate which embodies consideration of capital cost, remaining economic life of the property, and the degree of risk involved.
>
> [Lamm Associates v. West Caldwell Borough, 1 N.J. Tax 373, 377 (Tax 1980).]

Thus, central to the income capitalization approach is the appraiser's scrutiny, evaluation and analysis of data, information, statistics, costs, and a property's capacity to generate future benefits in order to determine the economic rent, "'market rent' or fair rental value'" of a property. Parkway Village Apartments Co., 108 N.J. at 270.

1.   Market or Economic Rent

The term economic or market rent refers to "the most probable rent that a property should bring in a competitive and open market reflecting all conditions and restrictions of the lease agreement, including permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options and tenant improvements." Appraisal Institute, The Dictionary of Real Estate Appraisal, 121-22 (5th ed. 2010). The economic or market rent attributable to a property may differ substantially from the actual rent derived on a property, which may be below market rates. Parkview Village Assocs. v. Collingswood Bor., 62 N.J. 21, 29-30 (1972). However,






"this does not mean that the actual rent is to be disregarded . . . 'in determining what is fair rental income, the actual rental income, while not controlling, is an element to be considered.'" McCrory Stores Corp. v. Asbury Park, 89 N.J. Super. 234, 243 (App. Div. 1965) (quoting Somers v. City of Meriden, 174 A. 184, 186 (Sup. Ct. Err. 1934)).

### A. Retail Leases

To compute the economic rent of the retail stores, the Expert identified fifteen retail leases. Comparable lease 15 was a lease offering and did not result in the execution of a lease agreement. Accordingly, during trial, the court struck consideration of comparable lease 15 in determination of the subject property's economic or market rent. See Harrison Realty Corp. v. Harrison Town, 16 N.J. Tax 375 (Tax 1997), aff'd, 17 N.J. Tax 174 (App. Div. 1997). In addition, comparable leases 12, 13, and 14 were lease modification agreements apparently entered into by WSCI with three existing tenants sometime after A&P vacated the subject property.[13] However, the date of each of the three lease modifications was not identified by the Expert in his appraisal report, nor during trial. Moreover, the Expert acknowledged during direct examination that he used comparable leases 12, 13, and 14 simply "to illustrate what's going on at the center. I wouldn't say that I really relied on these to determine the [market] rental rate." Because comparable leases 12, 13, and 14 were lease modifications, and were either modified gross or gross lease arrangements, and do not represent the exposure of the retail space to a competitive and open market, the court does not find them credible evidence of economic or market rent.

---

[13] The leases were apparently modified from net to gross, and the gross rent paid ranged from $5.00 to $24.00 per square foot. It was unclear from the Expert's testimony whether the leases are modified gross or gross leases. Additionally, the Expert made no adjustments to these three leases in his adjustment grid to account for the fact that these were gross leases and not net leases.






The remaining eleven comparable leases bore commencement dates between January 2004 and June 2016.  Four of the leases were in Warren County, five were in Sussex County, and two were in Union County.  The unadjusted rents ranged from $6.35 per square foot to $13.30 per square foot.  In determining the effective rent for the remaining eleven comparable leases, the Expert computed the average rent over the lease term.  See First Republic Corp. of Am., 16 N.J. Tax at 578 (concluding that the technique of averaging rents payable over the life of a lease is "consistent with sound appraisal principles").

The Expert then applied a -10% location adjustment to comparable leases 2, 5, and 6.  In the Expert's opinion, because comparable lease 2 had "better visibility" and "better traffic counts," 40,070 vehicles, compared to the subject property's 18,700 vehicles, the Expert opined that a -10% location adjustment was appropriate.[14]  In addition, in the Expert's opinion the location of comparable leases 5 and 6 in New Providence, Union County, New Jersey had "better surrounding demographics, population income characteristics."  Thus, the Expert applied a -10% location adjustment to comparable lease 5 and 6.

Moreover, despite the wide range of leased area of the remaining eleven comparable leases, fluctuating between 2,196 and 30,000 square feet, in the Expert's opinion he could not discern a size adjustment in the marketplace.  Thus, he made no size adjustment to any of the comparable leases in computing his adjusted rents.

Additionally, although the lease dates for the eleven remaining comparable leases range from January 2004 through June 2016, the Expert applied no adjustment for time or market

---

[14]  Although the Expert testified that traffic count studies "are one of the things that we look at" in making comparisons and adjustments to retail properties, the Expert did not include the traffic count studies in the Appendix to his report, nor did he furnish the court with copies of the traffic count studies he relied on.






conditions. In the Expert's opinion, despite the country having experienced a nationwide recession beginning in late 2008 and lasting for several years, he saw no basis to justify a time or market adjustment.

After applying the adjustments, the adjusted rents of the eleven remaining comparable leases varied from $6.35 per square foot to $13.30 per square foot, with an average of $10.32.[15]

After analyzing the adjusted and unadjusted rents, the Expert concluded an economic or market rent of $12.00 per square foot for the retail space in the subject property. The Expert then applied his $12.00 per square foot economic rent to 32,464 square feet of in-line retail space in the subject property to discern the Potential Gross Income for the subject property during each tax year. According to the Expert, the 32,464 square foot figure was derived from "tak[ing] down the A&P space, that's what you're left with." However, the court's analysis of the Expert's conclusion reveals that by deducting 45,190 square feet, representing the leased area formerly occupied by A&P, from the total shopping center square footage of 82,233 square feet, causes 37,043 square feet to remain (82,233 − 45,190 = 37,043 square feet). To reach the Expert's computation of 32,464 square feet, one must include demolition of an additional 4,583 square feet of retail area originally designed for occupancy by Walgreens.

However, the court has material concerns with respect to the quality, value, substance, and comparability of several leases identified by the Expert. Comparable lease 1 was entered into on January 1, 2004, approximately 11 years prior to the first valuation date involved in these tax appeals. In response to defendant's cross-examination on comparable lease 1, the Expert opined

---

[15] The range of adjusted rents reported in the Expert's appraisal report was $5.00 to $13.30 per square foot and the average rental rate was $10.06 per square foot as it included comparable leases 12, 13, 14, and 15.






that this "market is pretty static. I'm not going to say that this is the best lease to use to determine the market value, but I thought it told a lot of the story of what was going on in the market." However, effective cross-examination revealed that WSCI negotiated a lease for one of its in-line retail stores in 2004 at a substantially higher rental rate than comparable lease 1 that the Expert characterized as "too old" in determining the economic rent of the shopping center as of the October 1, 2015, October 1, 2016, and October 1, 2017 valuation dates. Thus, while comparable lease 1 executed in 2004 was deemed acceptable by the Expert in determining the subject property's economic rent, WSCI's 2004 lease for an in-line retail store at the subject property was characterized by the Expert as "too old." In sum, the court finds the Expert's inconsistency in the characterization and treatment of these two 2004 lease agreements renders comparable lease 1 meaningless in the determination of the subject property's economic or market rent.

Similarly, comparable lease 2 was originally entered into on February 9, 2008, approximately 7 years prior to the first valuation date involved in these tax appeals at an initial rate of $11.28 per square foot. However, comparable lease 2 was subsequently renewed, modified or amended in about January 2009 to an average rent of $11.64 per square foot. Thereafter, comparable lease 2 was again renewed, modified, or amended in July 2014 to extend the term for an additional six months through December 2014, at rental rate of $12.20 per square foot. Finally, comparable lease 2 was again renewed, modified, or extended in December 2014 for an additional term of six months at a rental rate of $9.76 per square foot. The court does not find that a lease agreement executed in 2008, and which has undergone three renewals, modifications, or amendments accurately represents the economic rent of the subject property on the valuation dates involved herein. The motivations of a landlord or a tenant can shape how the rental rate is fixed in a lease modification, extension, or renewal. Tenants unwilling to incur costs associated with






moving and relocating their business operations may be willing to pay a rent higher than the market. Conversely, landlords fearing that one tenant vacating will result in the mass exodus of tenants may be willing to offer a below-market rent to a tenant to entice them to remain. Without engaging in in-depth discussions with both the landlord and tenant to gain a better understanding and perspective of their relationship and what motivated them to execute the lease renewal, modification, or extension, it is of questionable usefulness. Here, the Expert acknowledged during cross-examination that he did not have any discussions with the tenant and thus, did not ascertain their motivations for executing the three lease modifications, extensions, or renewals. Therefore, the court finds comparable lease 2 not to be meaningful and credible evidence of the subject property's economic rent for the 2016, 2017, and 2018 tax years.

Comparable lease 3 is located at 128 Route 94, Blairstown, Warren County, New Jersey. Comparable lease 3 was a net lease at $12.00 per square foot, for 7,600 square feet of retail space executed in April 2013. The Expert obtained a copy of the lease from another appraiser and did not verify the lease terms with either the landlord, tenant, or any brokers involved in negotiation of the lease.

Comparable lease 4 is located at 46 Route 94, Vernon, Sussex County, New Jersey, approximately thirty (30) miles from subject property. Comparable lease 4 was a net lease for $12.75 per square foot, for 9,100 square feet of retail space executed in May 2013. The Expert obtained a copy of the lease from another appraiser and did not verify the lease terms with either the landlord, tenant, or any brokers involved in negotiation of the lease.

Comparable lease 5 and comparable lease 6 were part of a former A&P grocery store located at 598 Central Avenue, New Providence, Union County, New Jersey, more than thirty (30) miles from the subject property. Following A&P vacating the property the landlord subdivided

   

the A&P space and erected demising walls to create smaller leased areas. Comparable lease 5 consists of 16,934 square feet and comparable lease 6 consists of 10,274 square feet. The landlord apparently incurred costs to subdivide and fit-up comparable lease 5 of $894,473, or approximately $52.82 per square foot ($894,473/16,934 sq. ft. = $52.82). In addition, the landlord apparently incurred costs to subdivide and fit-up comparable lease 6 of $345,747, or approximately $33.65 per square foot ($345,747/10,274 sq. ft. = $33.65).[16] A net lease for comparable lease 5 was entered into in August 2012 at a rate of $10.88 per square foot and a net lease for comparable lease 6 was entered into in January 2013 at a rate of $10.23 per square foot.

Comparable leases 7, 9, 10, and 11 are all located in the same shopping center at 205 Route 23, Wantage, Sussex County, New Jersey, more than thirty (30) miles from the subject property. Since the disparity in leased area of these four leases is significant, from 2,196 to 10,512 square feet, the court finds that comparable lease 9 (2,204 square feet), comparable lease 10 (2,897 square feet) and comparable lease 11 (2,196 square feet) should be grouped separately from comparable lease 7 (10,512 square feet), as well as the other comparable leases which contain significantly larger leased areas.[17] Comparable lease 7 was a net lease entered into in December 2014 at an average rental rate of $7.17 per square foot over the lease term. Comparable lease 9 was a net lease entered into in March 2015 at an average rental rate of $11.57 per square foot over the lease term. Comparable lease 10 was a net lease entered into in June 2015 at an average rental rate of

---

[16] The Expert offered testimony during cross-examination that the landlord's costs of $33.65 to $52.82 per square foot to erect demising walls and fit-up comparable lease 5 and 6 did not include demolition costs, which the Expert had no information about.

[17] The key elements of comparison in a rental analysis is "location – [t]ime-distance linkages and unit-specific locations in project." Appraisal Institute, The Appraisal of Real Estate, 466 (14th ed. 2013). It is pivotal for an appraiser to establish appropriate "elements of comparison for a given appraisal through market research and [to] support those conclusions with market evidence." Id. at 390.






$12.61 per square foot over the lease term. Comparable lease 11 was a lease renewal, the tenant had apparently occupied the leased area on a month-to-month basis and entered into a new lease agreement in June 2016 at an average rental rate of $8.164 per square foot over the lease term.

Comparable lease 8 is located at 100 Main Street, Hackettstown, Warren County, New Jersey. Comparable lease 8 consists of a stand-alone retail store in downtown Hackettstown, an older store than the subject property. Comparable lease 8 was a net lease for $13.30 per square foot, for 8,770 square feet of retail space, executed in December 2014. The Expert obtained a copy of the lease from another appraiser and did not verify the lease terms with either the landlord, tenant, or any brokers involved in negotiation of the lease.

The Expert's concluded adjusted rents for the comparable leases containing leased areas of between 7,600 and 16,934 square feet are set forth below:

| Lease 3 | Lease 4 | Lease 5 | Lease 6 | Lease 7 | Lease 8 |
|---------|---------|---------|---------|---------|---------|
| $12.00 | $12.75 | $9.79 | $9.21 | $7.17 | $13.30 |

The court places the greatest weight on comparable leases 3 and 8, as those properties are in closest proximity to the subject property, are in Warren County, and did not require any adjustments. Conversely, the court places the least weight on comparable leases 4, 5, 6, and 7, as those shopping centers were located more than thirty (30) miles from the subject property, were located in Sussex and Union Counties, and several required adjustments to account for perceived differences in location. Further, the court emphasizes that the Expert offered little data and support, other than his years of experience as an appraiser, for his -10% adjustment to comparable leases 5 and 6. During cross-examination the Expert admitted that his -10% adjustment to comparable leases 5 and 6 amounted to simply a "judgment call." Moreover, the Expert






acknowledged during cross-examination that the traffic counts for the subject property (18,700), the traffic counts for comparable leases 5 and 6 (18,339), and the traffic counts for comparable lease 4 (12,000) and comparable lease 7 (15,917) were almost identical. In addition, the Expert opined that the demographics surrounding comparable leases 5 and 6 were superior to the subject property, justifying a -10% adjustment. However, the Expert offered no meaningful statistics, data, evidence, or analysis as to how the demographics surrounding comparable lease 5 and 6 translated into it being 10% superior to the subject property, or how that perceived superiority was measured. The Expert performed no paired analysis or study of the marketplace surrounding comparable lease 5 and 6 to demonstrate not only that it is superior, but that a -10% adjustment appropriately accounts for the locational differences.

Additionally, the Expert offered no meaningful evidence how the perceived similar location of and demographics surrounding comparable lease 4 and 7 led him to conclude that no adjustment was warranted. During cross-examination regarding the comparability of the demographics of Wantage to Washington Township, the Expert offered only that he "live[s] in that area" and that he "knows those markets very well . . . They're almost what we call a cherry comp." The Expert performed no paired analysis or study of the marketplace surrounding comparable lease 4 and 7 to demonstrate that it is truly a similar market to the subject property.

By definition, comparability does not require properties to be identical, as "differences between a comparable property and the subject property are anticipated. Such differences are dealt with by adjustments recognizing and explaining these differences, and then relating the two properties to each other in a meaningful way so that an estimate of the value of one can be determined from the value of the other." U.S. Life Realty Corp. v. Jackson Twp., 9 N.J. Tax 66, 72 (Tax 1987). Generally, properties are considered comparable when they "lend logical, coherent






support . . . show[ing] 'comparable building density ratios, functional similarities, . . . similarity of age, construction, and condition, and in some cases size.'" Ford Motor Co., 127 N.J. at 308 (quoting Shulton, Inc. v. Clifton City, 7 N.J. Tax 208, 218 (Tax 1983), aff'd, 7 N.J. Tax 220 (App. Div. 1984)). However, when the opinion of an expert is offered "[w]ithout explanation as to the basis, the opinion of the expert is entitled to little weight. . . ." Dworman v. Tinton Falls, 1 N.J. Tax 445, 458 (Tax 1980).

Accordingly, the court finds that the economic or market rent of the subject property's retail areas containing between 7,600 and 16,934 square feet, is $12.50 per square foot, as of each valuation date involved herein.

The Expert's concluded adjusted rents for the comparable rentals containing leased areas less than 7,600 square feet are set forth below:

| Lease 9 | Lease 10 | Lease 11 |
|---------|----------|----------|
| $11.57  | $12.61   | $8.64    |

However, the court observes that each of these comparable leases is located in the same shopping center in Wantage, Sussex County, New Jersey, a distance more than thirty (30) miles from the subject property, and located in a county different than the subject property. As outlined above, despite this seemingly material difference, the Expert opined that no location adjustment was warranted finding that the traffic counts, location, and demographics of Wantage comparable to Washington Township. However, as set forth above, the Expert offered little tangible statistical and analytical evidence with respect to the similarities between Washington Township and Wantage, other than his personal views, and did not offer any empirical evidence as to how those similarities translated into an accurate representation of comparable economic or market rent. In






sum, the Expert offered no data, research, or analysis, other than his personal observations and reporting on this single shopping center in Wantage.

Moreover, the court observes that comparable lease 11 is a lease renewal where the tenant had occupied the demised space since 2005 under a previously expired lease agreement. As expressed above, the motivations of a landlord or a tenant may shape how the rental rate is fixed in a lease modification, extension, or renewal. Without engaging in in-depth discussions with both the landlord and tenant to gain a better understanding and perspective of their relationship and what motivated them to execute the lease renewal, modification, or extension, it is of questionable usefulness. Here, the Expert acknowledged during cross-examination that he did not have any discussions with the tenant and thus, did not ascertain their motivations for executing the lease renewal. Therefore, the court finds comparable lease 11 not to be meaningful and credible evidence of economic or market rent.

Thus, the court turns to consideration of two remaining comparable leases containing retail areas less than 7,600 square feet. Given the limited sampling size of comparable retail leases comprising less than 7,600 square feet and the lack of credible analytical data demonstrating that these two leases are located in a market substantially similar to that of the subject property, the court cannot decisively conclude that either comparable lease 9 or 10 accurately reflect the market or economic rent for the subject property as of the valuation dates at issue. Accordingly, the court concludes that insufficient analytical and market data has been proffered by WSCI and the Expert to enable the court to discern the economic or market rent for the subject property's retail stores containing less than 7,600 square feet.

   

### B. Pad Sites

The Expert offered testimony that the subject property contains three pad sites, one developed with a McDonald's fast-food restaurant, and the other two which are undeveloped. In computing the economic rent of the three pad sites, the Expert relied exclusively on a 1995 ground lease between WSCI and McDonald's.[18] The Expert's appraisal report states that the annual rent for the pad site was $62,355 and "[u]pon A&P's departure, the rent was reduced to $31,177 as per the lease agreement." No other evidence or testimony was offered to the court with respect to how this reduction in ground rent was calculated. However, because the Expert opined that WSCI knew A&P was in bankruptcy and "closing in 2015," the Expert applied the $31,177 McDonald's pad rental rate to the three pad sites as of each valuation date herein to determine an economic rent of $93,531 ($31,177 x 3 = $93,531).

Notably, the Expert offered no other market evidence of value of the pad sites. The Expert did not consider, nor did the Expert research or evaluate any other ground leases for the tax years at issue. Moreover, the Expert offered no evidence of other comparable leases for fast-food restaurants. Cross-examination further revealed that the Expert had only limited familiarity with the McDonald's site, did not measure the McDonald's building, and was unable to recite basic information about the McDonald's site like whether it possessed one drive-thru window or two drive-thru windows.

The court finds the Expert's analysis of the economic or market rent for the pad sites to be fundamentally flawed and not credible. Here, the Expert relied on a 1995 ground lease to establish

---

[18] The 1995 land lease between WSCI and McDonald's apparently expired in 2016. However, the Expert was unfamiliar with the terms of the land lease renewal and was initially unsure whether the lease renewed, reasoning during direct examination that it must have renewed because McDonald's continued to occupy the subject property in 2018, as of the date of his appraisal report.






a market rent for the subject property's three pad sites for the 2016, 2017, and 2018 tax years. Although more than twenty years elapsed from execution of the McDonald's ground lease, and without having conducted any current market analysis, the Expert opined that the McDonald's ground lease rent should be the economic rent for the 2016, 2017, and 2018 tax years. Moreover, while limited testimony and evidence was elicited during trial regarding the terms of the McDonald's lease, the Expert's appraisal report states that the "rent was reduced . . . as per the lease agreement" (emphasis added). Thus, it is possible that under the terms of the 1995 McDonald's ground lease, the parties expressly stipulated that the rent would be reduced by 50% ($62,355/2 = $31,177) in the event the shopping center attained a certain vacancy rate or the shopping center's anchor tenant vacated. However, neither WSCI nor the Expert offered any evidence or testimony as to how the reduced rental rate of $31,177 was computed.[19] Without this critical evidence, the court cannot reasonably conclude that the $31,177, per pad value opined by the Expert represents the economic or market rent. Fundamental to the conclusion of an economic or market rent is that the value reflects the most probable rent that the property would bring in an open and competitive market. Here, the Expert offered no credible evidence permitting the court to rationally conclude that the $31,177 value represents what the subject property would reap in an open and competitive market. Accordingly, the court rejects the Expert's opinions of value for the subject property's three pad sites.

---

[19] For instance, was the reduced ground rent based on a fixed formula set forth under the 1995 ground lease agreement? Was the $31,177 a negotiated rent between WSCI and McDonald's based on other fast-food restaurant leases in the marketplace?






2.      Potential Gross Income

The next step under the income capitalization approach to value is computation of a property's Potential Gross Income. To determine Potential Gross Income the concluded economic or market rent is applied to the square footage of the improvements. After determining Potential Gross Income, the applicable vacancy and collection loss rate is applied to calculate a property's Effective Gross Income.

Here however, as a result of the court's inability to discern the economic or market value of: (i) the subject property's retail space comprising less than 7,600 square feet; (ii) the subject property's excess or surplus land, if any; and (iii) the three pad sites located on the subject property, the court is rendered unable to determine the subject property's Potential Gross Income. Correspondingly, the court is unable to discern the subject property's estimated fair market value as of the October 1, 2015, October 1, 2016, and October 1, 2017 valuation dates.

3.      The Glen Wall dilemma

Nonetheless, the court is mindful of its obligation "to apply its own judgment to valuation data submitted by experts in order to arrive at a true value and find an assessment for the years in question." Glen Wall Associates v. Wall. Twp., 99 N.J. 265, 280 (1985) (citing New Cumberland Corp. v. Roselle Borough, 3 N.J. Tax, 345, 353 (Tax 1981)). However, to enable the court to make an independent finding of true value, credible and competent evidence must be adduced in the trial record.

Here, the court's review of the Expert's testimony and appraisal report regarding his highest and best use analysis and comparable leases discloses material issues of credibility, rendering his conclusions of dubious value. Although the court was able to discern from the testimony offered an economic or market rent of $12.50 per square foot, for the subject property's






retail space containing between 7,600 and 16,934 square feet, the court was unable to determine an economic or market rent to be applied to the subject property's retail space comprising less than 7,600 square feet. Moreover, based on the Expert's faulty analysis of the pad sites, the court was unable to ascribe any value to the subject property's three pad sites. Thus, without credible evidence of economic or market rent supported by objective, market extracted data, the court is unable to discern the units of value to be applied to each of the subject property's component parts.

The court's independent determination of value must be based "on the evidence before it and the data that are properly at its disposal." F.M.C. Stores Co. v. Morris Plains Borough, 100 N.J. 418, 430 (1985). Here, the court concludes that based on the Expert's testimony and appraisal report, the trial record contains insufficient credible information to enable the court to make a reliable independent finding of the subject property's value as of the October 1, 2015, October 1, 2016, and October 1, 2017 valuation dates.

Accordingly, for the above stated reasons, the court will enter judgments affirming the subject property's 2016, 2017, and 2018 local property tax assessments.

Very truly yours,

Hon. Joshua D. Novin, J.T.C.




